446 P.2d 480

Jewel H. ENGLAND, husband of Velma England, dealing with his sole and separate property; and Jewel H. England and Velma England, husband and wife, Appellants,

v.

ALLY ONG HING and Fon Jing Hing, husband and wife, Appellees.

No. 2 CA–CIV 304.

Court of Appeals of Arizona.

Oct. 29, 1968.

Review Granted Feb. 4, 1969.
Rehearing Denied Dec. 17, 1968.
See 8 Ariz.App. 558, 448 P.2d 128.

Elmer C. Coker, Phoenix, and Tom Fulbright, Florence, for appellants.

Stockton & Hing, by Robert Ong Hing, Phoenix, for appellees.

DONOFRIO, Judge.

Jewel England brought an action to quiet title to two springs for which he had certificates of water rights and prayed for injunctive relief. From a judgment granting him some, but not all that he asked, the plaintiff appeals to this Court.

The facts are as follows. Since 1910 there has been maintained on a continuous basis 250 to 150 range cows and bulls in the general vicinity of the Battle Axe Ranch headquarters. The cattle have ranged generally for several miles in all directions. They have watered from various natural water sources in the area.

The ranch consists of 80 acres of patented land and approximately 25 sections of leased land. Running through the patented land and past the ranch headquarters is a wash known as Walnut Grove Creek running generally from the northeast to the southwest. One of its tributaries lying north of the headquarters is a creek or gully which is called Fig Spring Canyon. Northeast of the ranch headquarters is a patented mining claim consisting of 20 acres and known as Wild Cow No. 9. The Walnut Grove wash runs through this mining claim as does its tributary coming in from the northwest. Further south and closer to the headquarters is Silver Creek mining claim through the length of which runs the Walnut Grove Creek.

There are two major sources of year-round water. One is the water immediately south of the old highway crossing the Walnut Grove Creek in the southern part of what is now the Silver Creek mining claim. A retaining wall has been built in this area and at the foot of this retaining wall and in the bed of the creek there has been and still is a small stream of water running down into the sand within a distance of approximately 20 or 25 feet. Another source of water was in the Fig Spring Canyon which is situated in what is now called the Wild Cow No. 9 claim. The center of this source is in approximately the center of the new paved highway running through the Wild Cow claim. At this point where the new highway crossed the canyon, a large amount of fill had been placed over Fig Spring in 1954.

In 1947 plaintiffs made application to the State Land Commission of Arizona for two water rights. One was in connection with Fig Spring. The point of diversion and the point of beneficial use was designated as the approximate center of the source water mentioned above which ended up in the center of the new highway. The plaintiffs also applied for a water right as to Walnut Grove Spring. The point of diversion and the point of beneficial use was here designated as a concrete box near the Battle Axe headquarters.

At the time the new highway was built, in approximately 1954, the main source of water in Fig Spring Canyon was covered with fill and temporarily there was no water available there. Approximately 60 days after the construction, water began to seep out of the side of the fill below the highway and ran down the stream about as well as before.

The defendants, Hings, acquired the Wild Cow and Silver Creek mining claims. The Hings started to develop these properties for residential subdivision purposes in February 1963. Since then they have leveled large portions of the Wild Cow and Silver Creek area for residential sites. In the process of leveling the properties and in building roads thereto, the Hings have put a dike across Fig Spring Canyon, approximately 175 feet downstream from the spot where the water began seeping out of the highway. This dike is about 30 feet in height and near the top thereof there is a pipe to permit water to pass downstream after it has reached that height. The bottom of Fig Spring Canyon has been narrowed somewhat by the leveling operations and a small amount of debris has been placed in the bottom of the canyon.

At or about the time of the commencement of the leveling operations, the amount of water in Fig Spring Canyon below the highway substantially decreased. There was no longer water seeping from the side of the highway fill, though the moss in the area where the water did seep out is still visible.

The Hings have also changed the natural channel of the Walnut Grove Creek to a substantial extent just above the Silver

Creek mining claim and through the Silver Creek mining claim. The dike built by the Hings is an earthen dike constructed of the natural soil pushed in place by tractors. No suitable means has been taken to hold this dike in place and it is probable that within the next ten years a flash flood will carry away most of this natural soil downstream.

The only access and the only feasible route to the Battle Axe headquarters until recent years has been a road taking off from the old highway where it crossed the Walnut Grove Creek on the Silver Creek mining claim and going directly down the bed of the creek about 1000 feet to the Battle Axe headquarters. This road has been used continuously since prior to 1946, and probably several decades before that. This road has been used by the owners of the Battle Axe Ranch under the belief that they have a right to use it as access to their property. The right has no particular basis other than custom and usage in a country where land was cheap and it was generally considered that a person should have the right to go from a public highway to his home by the only feasible route.

Also on the Silver Creek mining claim is a turnaround which has been used since the new highway was constructed in about 1954. This turnaround was obliterated by the grading of the defendants some time in 1963. The turnaround was used by cattle trucks coming to the Battle Axe headquarters which were unable to make the sharp turn created by the angle at which the old highway joined the creek bed at this point. The use of this turnaround has been only occasional. No claim of right was ever transmitted by the users of this turnaround or by the owners of the Battle Axe Ranch to the owners of the Silver Creek mining claim.

Fifty years prior to the filing of this action, cattle from Battle Axe Ranch have grazed generally over the area known as the Silver Creek and Wild Cow mining claims. There have been feed and salt troughs installed at various times on these claims for these cattle. The plaintiffs claim ownership of these claims on the grounds of adverse possession.

The Walnut Grove Creek served as the main path on which cattle could be driven or could conduct themselves from the area of the Battle Axe headquarters to the grazing land above the Wild Cow mining claim. Unless this passage is used there is no practicable way to get these cattle from the northern range down to the area of the Battle Axe headquarters. Usually the main channel of the dry stream was used. This main channel has moved over the many years due to the rushing water.

There is a direct conflict in the evidence as to whether the artificial channel now constructed by the defendants is sufficiently wide to drive plaintiffs' cattle up and down. This conflict the trial court resolved in the defendants' favor, finding it is of adequate width, but that if any substantial amount of rock and debris should be deposited therein it would render the same unfeasible for driving cattle.

The plaintiffs' primary dispute with the lower court's judgment was the finding by the lower court that the defendants were not the cause of the drying up of Fig Spring. Such a contention by the plaintiffs causes this Court to delve into some of the basic water law of this state.

The doctrine of prior appropriation is the keystone around which all of the water law of Arizona has been constructed. The courts originally credited the Arizona water law to the Mexican law, and before that, to the native tribes of Pimas, Papagos and other pueblo Indians, including the ancient Hohokams, who were thought to have used the prior appropriation theory. Clough v. Wing, 2 Ariz. 371, 17 Pac. 453 (1888). This basis for the law was later found to be erroneous. The declarations by the First Legislature of the Territory of Arizona, in 1864, amounted to a statutory repudiation of the riparian rights doctrine and was the first espousing of the fundamental princi-

ples which were to govern the use of water in Arizona for the future. Maricopa County Municipal Water Conservation Dist. No. 1 v. Southwest Cotton Co., 39 Ariz. 65, 4 P.2d 369 (1931). It was felt that this was the only practical method of disbursing the sparse water in the vast, arid regions which make up a large portion of our state. This repudiation of the riparian rights doctrine and acceptance of prior appropriation was later incorporated into the Arizona Constitution, Article XVII, Sec. 1, A.R.S. when Arizona became a state, and put into the Arizona Water Code in 1919, Chapter 164, Session Laws of 1919 (now A.R.S. § 45–101 et seq.).

■ It is the recognized law in Arizona that when a person acquires land he takes it subject to any water rights which might have been initiated according to the law. Of course, these rights must not have lapsed nor become void for some other reason. Parker v. McIntyre, 47 Ariz. 484, 56 P.2d 1337 (1936).

■ Under the doctrine set up by the Supreme Court of Arizona in Parker v. McIntyre, supra, two questions must be answered. First, were the waters at the time of appropriation subject to appropriation under the laws of Arizona? Second, did the alleged appropriators make a valid appropriation of the water according to Arizona statute? Fortunately, our Supreme Court has given us a definition of appropriable springs:

"* * * the phrase 'springs on the surface' refers only to the waters which emerge from the earth without artificial assistance, and that no appropriation can be made of percolating waters developed through the means of tunnels, cuts, wells or other artificial structures, even though those waters may by such structures be brought to the surface at the place where a 'spring on the surface' already exists."
Fourzan v. Curtis, 43 Ariz. 140, 145, 29 P.2d 722, 724 (1934).

There appears to be no dispute that at the time of the application and appropriation Fig Spring was a spring subject to appropriation under the definition set forth in Fourzan, supra. The trial court in this case determined that the certificates of water rights were legally acquired and were valid acts of appropriation.

There appears to be substantial evidence to sustain a finding that Hing was not the cause of Fig Spring drying up. The confusion seems to arise from the fact that there are four springs in the area. Several of England's witnesses did not even know of these other springs. But Mr. Glen Akers, the man who bulldozed over the spring, testified that he did not bulldoze over Fig Spring, but over some other spring. He later testified that there were in fact four springs and that since the highway had been built there was no such thing as Fig Spring. The problem appears to be that the whole area is called Fig Spring, but the one spring called Fig Spring has dried up and was covered by about 80 feet of fill in the center of a new highway several years prior.

■ From this it appears that there was ample evidence for the court to determine that the water from which the cattle were drinking after the highway was built came from these other springs which were not part of the original appropriation filed pursuant to the statute. There was sufficient evidence for the court to find that after the highway was built the water from Fig Spring ceased to flow, but there was a wet spot where water appeared to seep from the highway fill where Fig Spring used to be.

As to the other springs, the trial court considered them as separate and distinct from Fig Spring. There was nothing brought to the attention of this Court which would sustain any other finding. There was no evidence that the other springs came from the same source as Fig Spring, or that the appellees in any way interfered with the subterranean flow of any water to which the appellants were entitled.

■ Underground water is presumed to be percolating. The burden of proof is

upon the person asserting otherwise, to show that the subterranean water flows in natural channels between well-defined banks. This must be done by clear and convincing evidence. If this is shown, then the subterranean waters are appropriable, the same as surface waters. Maricopa County Municipal Water Conservation Dist. No. 1 v. Southwest Cotton Co., supra. Percolating waters are not subject to appropriation. Bristor v. Cheatham, 75 Ariz. 227, 255 P.2d 173 (1953).

The reason for this rule is that percolating water sources are difficult to perceive and measure. Any damage to such a water supply cannot be foreseen or avoided. Any other rule would prevent the normal and legitimate development of land. Zimmerman v. Union Paving Co., 335 Pa. 319, 6 A. 2d 901 (1939).

■ There is no evidence through which the court could ascertain that when the water was originally appropriated there was an actual appropriation of an appropriable subterranean stream or lake acting as a source for all of the springs in that area. The trial court correctly presumed that the ground water was percolating water, and as such, the landowner could use his property without limitation or liability to a user of the percolating water, as long as such use of the land is reasonable and beneficial. Bristor v. Cheatham, supra; Hart v. D'Agostini, 7 Mich.App. 319, 151 N.W.2d 826 (1967).

There being no Arizona cases directly on point, it is necessary to see what the courts of other jurisdictions have said in this area. Our Supreme Court has stated that cases arising under the Oregon Water Code are very persuasive, since the Arizona Water Code was adopted almost verbatim from Oregon's. Stewart v. Verde River Irrigation & Power Dist., 49 Ariz. 531, 68 P.2d 329 (1937).

The Oregon Supreme Court has said that it actually has a dual system of water rights embracing both the riparian and prior appropriation doctrine. Admittedly, very little vestige of the riparian doctrine remains, especially against those who base their claims on their priority of appropriation under the Water Code. However, riparian rights are still recognized in the adjudication of water rights in Oregon. Fitzstephens v. Watson, 218 Or. 185, 344 P.2d 221 (1959), 36 Ore.Law Review 193 (1957).

■ The Oregon Supreme Court has also quoted with approval Farnham on Water and Water Rights, Vol. 3, 1904 Ed., Sec. 936:

> "The rule that one may make such reasonable use of his own property as he chooses, regardless of the effect on the percolating water, operates with full force although the effect is to destroy a spring on a neighbor's land, unless the spring is supplied by water flowing in a known channel." Bull v. Siegrist, 169 Or. 180, 126 P.2d 832, 834 (1942).

A fortiori, if the destroyed spring was on the owner's own property, then he could also destroy that spring. That is the situation in this case. The defendants have the right to cover up all of the springs except Fig Spring proper to which the plaintiffs have a prior right.

■ Plaintiffs state that they and their predecessors in interest appropriated water in Walnut Canyon by continuous use since prior to 1919, over and above the water rights represented by the certificates. The trial court answered this in the negative. We agree with the trial court.

The court found that ordinarily there is no running water in Walnut Creek for cattle to consume except during the wet season. During the dry season the cattle drank only out of the springs. If plaintiffs' desire is to call this wet season water flood water, then it would have been necessary for them to follow the statute passed before the Water Code of 1919. The law of the Arizona Territory permitted appropriation of flood waters if notice of such was posted at the place of diversion. Chapter 86, Session Laws of 1893. If these waters

used by the cattle in Walnut Creek are considered flood waters, there is no evidence of appropriation by the plaintiffs pursuant to the 1893 statute.

If plaintiffs' desire is to call this wet season water intermittent waters, they could not have legally appropriated it until 1921, and then only by following statutory procedure. The original Bill of Rights of Arizona adopted by the First Legislature, and the Howell Code, did not include intermittent waters. In fact, intermittent waters are not mentioned in the Water Code until 1921. Section 1, Chapter 64, Session Laws 1921. The Arizona Supreme Court has stated that the absence of percolating waters being mentioned in the Water Code means that they are not appropriable. Maricopa County Municipal Water Conservation Dist. No. 1 v. Southwest Cotton Co., supra; Bristor v. Cheatham, supra. Using the usual rule of "expressio unius", the intermittent waters could not have been appropriated until 1921 when they were put into the statute. There is no evidence that these intermittent waters were ever appropriated pursuant to the statute.

Plaintiffs feel that defendants are liable for damages resulting from a dike being placed in the natural channel of Walnut Canyon. This caused the channel to be moved into a new artificial channel. The general rule is stated in Am.Jur. that:

"* * * the owner of lands through or along the border of which a natural water course flows may accumulate surface water falling upon lands adjacent thereto, and cast the same into such stream, without liability to a lower riparian owner for damages, although the flow of waters is thereby accelerated and the volume increased, provided that this is done in the reasonable use of his own land." 56 Am.Jur. Waters § 73, page 559.

And,

"There can be no doubt as to the right of a land owner to divert or change the course of a stream flowing through his land, provided he returns it to its original or natural channel before it reaches the land of the lower owner." 56 Am.Jur. Waters § 14, Page 504.

Both of these sections were quoted with approval in Diedrich v. Farnsworth, 3 Ariz. App. 264, 413 P.2d 774 (1966).

The trial court felt that defendants have done only that which is permitted them by the law of Arizona in setting up the dike. The court did, however, feel that the situation required some mandatory injunctive relief. The court therefore ordered the defendants, by some means in good engineering practice, to stabilize the dike so as to reasonably assure that the dike and bank material would be kept intact in time of flood. This would prevent loose material from being washed downstream in any degree substantially in excess of that which would have been washed downstream had defendants not modified and tampered with the natural channel. Such injunctive relief is for the general welfare of the country and in the interests of good land husbandry, and should be commended.

■ Plaintiffs take the view that they are in adverse possession of the unenclosed land by using it for grazing for a period in excess of ten years. This Court feels that absent a statute permitting adverse possession by grazing cattle, one does not gain property by adverse possession of unenclosed land by using it for grazing. Orsborn v. Deep Rock Oil Corp., 153 Tex. 281, 267 S.W.2d 781 (1954).

■ Plaintiffs also contend that they have acquired the right to the turnaround and roadway on the Silver Creek mining claim by adverse use or prescription. The question as to whether or not the use was under a claim of right, or a mere neighborly accommodation, was a question of fact to be determined by the court in the light of the relations of the parties, their conduct, the situation of the property,

and all the surrounding circumstances. La Rue v. Kosich, 66 Ariz. 299, 187 P.2d 642 (1947). The trial court found for the plaintiffs as to the road, but for the defendants as to the turnaround. There being substantial evidence to sustain the Judge's findings, and the court's judgment being reasonably based on the facts presented, it will not be disturbed. Rightmire v. Sweat, 83 Ariz. 2, 315 P.2d 659 (1957); State ex rel. Herman v. Southern Pacific Company, 8 Ariz.App. 238, 445 P.2d 186 (Filed September 1968).

It is a further contention of the plaintiffs that they have a right to drive the cattle over the two mining claims in order to use the waters of Fig Spring and and to drive their cattle from the headquarters to the northern range and back. The State Land Commission, when giving the rancher a certificate to use water cannot, by their permit to appropriate the waters, give the appropriator an easement across the privately owned land of another. Robinson v. Cuneo, 137 Cal.App.2d 573, 290 P.2d 656 (1955); 93 C.J.S. Waters § 192. However, the general rule is that a right of easement to take waters from a spring located on the land of another may be acquired if all of the elements to gain a prescriptive right are present. 56 Am. Jur. Waters Sec. 134. Arizona follows this general rule. Conness v. Pacific Coast Joint Stock Land Bank, 46 Ariz. 338, 50 P.2d 888 (1935); Gusheroski v. Lewis, 64 Ariz. 192, 167 P.2d 390 (1946). There was ample evidence for the trial court to find all of the requisite elements present, and there was no abuse in determining the length and width of this easement, or the right-of-way.

The appellate courts are bound by a trial court's findings of fact if there is reasonable evidence to substantiate them. Grant v. White, 103 Ariz. 257, 439 P.2d 828 (1968). We believe the evidence supports the findings and we can find no error in the law applied.

Judgment affirmed.

CAMERON, C. J., and STEVENS, J., concur.

NOTE: This cause was decided by the Judges of Division One as authorized by A.R.S. § 12-120 subsec. E.