459 P.2d 498

Jewel H. ENGLAND, husband of Velma England, dealing with his sole and separate property; and Jewel H. England and Velma England, husband and wife, Appellants,

v.

ALLY ONG HING and Fon Jing Hing, husband and wife, Appellees.

No. 9509–PR.

Supreme Court of Arizona,
In Banc.

Sept. 29, 1969.

Rehearing Denied Oct. 28, 1969.

Elmer C. Coker, Phoenix, Tom Fulbright, Florence, for appellants.

Stockton & Hing, by Robert Ong Hing, Phoenix, for appellees.

LOCKWOOD, Vice Chief Justice.

This case comes before us on petition for review of the decisions of the Court of Appeals, 8 Ariz.App. 374, 446 P.2d 480 (1968); 8 Ariz.App. 558, 448 P.2d 128 (1968). Opinions of the Court of Appeals vacated.

The plaintiffs in this action are the owners of a cattle ranch in northeastern Pinal County called the Battle Axe Ranch. In 1962 defendants acquired title to two mining claims lying in proximity to these ranch lands. In the process of preparing these claims for housing developments, defendants made substantial changes in the terrain —changes which the plaintiffs contend destroyed certain of their water rights and generally rendered it difficult to carry on normal ranching operations in that area.

This ranch has been in operation since before 1910. It is comprised of eighty acres of patented land and twenty-five sections of grazing land leased from the federal and state governments. Running through this land from northeast to southwest is a canyon or wash known as Walnut Grove Canyon. This canyon originates about two miles northeast of the headquarters (ranch buildings), runs past the headquarters, and ends about three miles southwest of the ranch at the Gila River. Approximately a mile north of the headquarters another wash known as Fig Spring Canyon enters Walnut Grove Canyon from the northwest.

The two patented lode claims acquired by the defendants, called Wild Cow No. 9

and Silver Creek, are each about twenty acres. The Wild Cow No. 9 claim lies approximately a mile north of the headquarters and includes Fig Spring Canyon (from its intersection with Walnut Grove Canyon north to where State Highway 177 crosses it) and a portion of Walnut Grove Canyon. The Silver Creek claim is closer to the headquarters, and Walnut Grove Canyon runs the length of it.

In the immediate vicinity of the Battle Axe Ranch there were three primary sources of water: (1) "Fig Spring" which arose in Fig Spring Canyon and was located on defendants' Wild Cow No. 9 claim; (2) a "retaining wall spring" which broke out near the point where the old Ray-Superior highway crossed Walnut Grove Canyon and was located on the southern part of the Silver Creek claim; and (3) "Walnut Grove Spring" located near the headquarters which had been enclosed with a concrete box and provided water for domestic purposes. In 1947 plaintiff and his brother applied for and were granted water rights in Fig Spring and Walnut Grove Spring. The hearing in conection with these applications was attended by a Mr. E. H. Hughes, a predecessor in interest of defendants.

In February, 1963, defendants began to grade and develop the two mining claims for residential subdivision purposes. In the process of their construction defendants have placed a dike thirty feet in height across Fig Spring Canyon, have constructed another dike near the Silver Creek claim to divert the channel of Walnut Grove Canyon as it passes across this claim, and have generally altered both canyons so that their channels have been narrowed to approximately twenty feet in width. Plaintiffs complain that these operations have destroyed Fig Spring and rendered it impossible for them to utilize their customary route through the canyons in moving their cattle from the headquarters to grazing areas north of Fig Spring. In the court below plaintiffs sought to enjoin defendants from further construction activities and to compel them to restore Fig Spring and

Walnut Grove Canyon to their natural state. The court sitting without a jury found in favor of the defendants. We append a diagram, not to scale, but showing relative locations of the properties and areas involved.

Plaintiffs argue initially that the court erred in rejecting plaintiffs' contentions that they had acquired title to these two mining claims by adverse possession. The occupancy or possession upon which plaintiffs rely is the grazing, feeding, and driving of their cattle over these mining claims since at least 1946. While there were fences around the exterior of the Battle Axe Ranch, which, in a sense enclosed the mining claims in question, the claims themselves were never fenced off from the surrounding land.

The issue of whether one may gain title by adverse possession by the mere grazing and ranging of cattle over unenclosed land is one of first impression in this jurisdiction. While a score of states have split almost equally on this question, Texas, from which our adverse possession statute was derived, has held that such conduct will not lead to title by adverse possession. Although we are not bound by the construction given a statute by the courts of the state from which it was adopted, we consider such construction to be persuasive. State v. McDonald, 88 Ariz. 1, 352 P.2d 343 (1960). Also, when Arizona adopts a statute from another state, it will be presumed to have been adopted with the construction previously placed on it by the courts of that state. In Re Estate of McConnell, 101 Ariz. 538, 421 P.2d 895 (1966).

With these rules of statutory construction before us we turn to the landmark Texas decision of De Las Fuentes v. Macdonell, 85 Tex. 132, 20 S.W. 43 (1892). Holding that grazing cattle on unenclosed lands would not give defendant title to the land through adverse possession, the court stated:

"* * * we * * * indicate the rule in this court to be that the mere occupancy of land by grazing livestock upon it, without substantial inclosures or other

permanent improvements, is not sufficient to support a plea of limitation under our statutes. Uninclosed land, in this state, has ever been treated as commons for grazing purposes; and hence the mere holding of livestock upon it has not been deemed such exclusive occupancy as to constitute adverse possession. There must be an 'actual occupation of such nature and notoriety as the owner may be presumed to know that there is a possession of the land' * * * 'otherwise, a man may be disseised without his knowledge, and the statute of limitations run against him, while he has no ground to believe that his seizure has been interrupted.' " 20 S.W. at 44.

Hinds v. Killough, 332 S.W.2d 101 (Tex. Civ.App.1959), rev'd. on other grounds 161 Tex.178, 338 S.W.2d 707 (1960); and Orsborn v. Deep Rock Oil Corp., 153 Tex. 281, 267 S.W.2d 781 (1954).

■ We find the reasoning of the Texas court persuasive. In our own state, as in Texas, it is not uncommon for cattle to range at will across the open ranch lands. An owner of a mining claim over which cattle grazed would certainly not be expected to surmise that the rancher who owned these cattle was asserting any claim of right to his land. Such use must be viewed as permissive and for that reason does not fall within A.R.S. §§ 12–521 and 12–526 which confer title by adverse possession. We hold therefore that the mere grazing of cattle, absent any other acts of dominion over the land, will not support a claim to land based on adverse possession.[1]

Plaintiffs next argue that the evidence shows that defendants, through their construction on the Wild Cow No. 9 claim caused the drying up of Fig Spring, and that the court therefore erred in failing to compel defendants to restore its flow.

This contention is without merit. It is not the function of this Court to re-try factual issues. As we stated in Barnett v. Hitching Post Lodge, Inc., 101 Ariz. 488, 421 P.2d 507 (1966): "We have consistently held that this court will be bound by the trial judge's decision on matters of fact in a non-jury case as long as there is competent evidence in the record to support the finding." 101 Ariz. at 490, 421 P.2d at 509. The judge below specifically noted in his findings of fact that there was no evidence showing that, in the course of their construction activities, defendants stopped or obstructed any subterranean waters which were the source of Fig Spring. Rather he found that over the last fifty years the whole area generally had been drying up due to reduced rainfall. While the spring has dried up during the period defendants were doing their construction work, the judge found that there was no cause and effect relation between the two events.

■ The record bears out the trial court's conclusion. In 1954 when Highway 177 was constructed across Fig Spring Canyon, Fig Spring itself fell almost exactly in the center of the new road and was covered over with fill. Approximately sixty days later water broke out of the side of the fill and ran down the canyon. The evidence is in conflict as to the flow of Fig Spring subsequent to its being covered by the highway. However, even if the testimony that Fig Spring was not affected by the highway is accepted, the record is barren of evidence that defendant covered or otherwise destroyed the spring. In fact, the point at which the spring broke out of the highway fill is clearly visible. There is no evidence that defendant in any way caused the drying up of Fig Spring, either by covering it or by grading out its subterranean sources. Since

1. In Fritts v. Ericson, 103 Ariz. 33, 436 P.2d 582 (1968), we cited Martinez v. Mundy, 61 N.M. 87, 295 P.2d 209 (1956), and Griswold v. Lagge, 132 Mont. 23, 313 P.2d 1013 (1957), as cases where courts had held that mere grazing would constitute adverse possession. Analysis of these latter two cases shows that in both instances acts of dominion which went beyond the grazing of unenclosed lands were present.

**70**

the trial judge's conclusion in this matter is amply supported by the record, we are bound by his findings.

Conceding arguendo the finding that defendants were not responsible for the drying up of Fig Spring, plaintiffs nevertheless maintain that since they are the owners of the Certificate of Water Rights on the spring, the court should have decreed that they had the right to restore its flow and to keep it cleaned out. As an abstract proposition of law this may be correct, but we fail to see how it helps plaintiffs in the instant case.

■ After viewing the premises, the court specifically found that defendants' dozer operator had not covered the point on the highway fill where Fig Spring broke out. In the course of their construction operations defendants have narrowed the channel of Fig Spring Canyon, but, save for the erection of a dike they have not substantially obstructed the flow of water down Fig Spring Canyon.

Plaintiffs complain that when the trial court amended its original judgment, it struck language enjoining defendants and "any of their successors in interest" from interfering with plaintiffs' right to the water flowing in Fig Spring Canyon. They state that in the absence of such broad injunctive relief there will be nothing to prevent subsequent owners of these mining claims from engaging in similar acts.

■ We do not believe that it is necessary to include in the judgment language enjoining defendants' successors in interest. A judgment against defendants will bind all persons who may subsequently succeed to defendant's interest in the two mining claims. This point was thoroughly explored in Cruse's Executor v. Haggard, 241 Ky. 442, 44 S.W.2d 290 (1931):

"* * * 'A vendee or grantee is in privity with his vendor or grantor, and bound by judgments against him * * * rendered previously to the sale of the property. Where water rights have been adjudicated a successor in interest of one of the parties is bound by the judgment and by an injunction forming part of it.'" 44 S.W.2d at 292.

See also Bussan v. Donald, 244 S.W.2d 271 (Tex.Civ.App., 1951).

As one of its conclusions of law the court held that plaintiffs had not appropriated any of the waters flowing in Walnut Grove Canyon over and above their certificate rights in Fig and Walnut Grove Springs. Plaintiffs stoutly maintain that continuous use of these waters since prior to 1919 constituted a valid appropriation of them.

■■ Two distinct sources of water are involved: (1) the seasonal waters of Walnut Creek, and (2) waters flowing into Walnut Grove Canyon from the "retaining wall spring". Turning first to the seasonal waters running down Walnut Grove Canyon, it is clear that such waters are appropriable as a stream even though they flow only intermittently: "* * * 'A stream is a watercourse having a source and terminus, banks and channel, through which waters flow, at least periodically * * * a stream does not lose its character as a watercourse even though it may break up and disappear. * * *. As we have observed, a continuous flow of water is not necessary to constitute a stream and its waters stream waters.'" Southern Pacific Co. v. Proebstel, 61 Ariz. 412, 418, 150 P.2d 81, 83 (1944). Since at least 1893 stream waters have been appropriable in this state. See Howard v. Perrin, 8 Ariz. 347, 76 P. 460 (1904). Therefore, since the waters of Walnut Grove Canyon constitute stream waters, and since such waters have long been deemed appropriable, the question becomes whether plaintiff and his predecessors took the proper steps to appropriate these waters. It is conceded that plaintiffs hold certificates only in Fig and Walnut Grove Springs.

The methods of appropriating water prior to 1919 are discussed extensively in

Parker v. McIntyre, 47 Ariz. 484, 56 P.2d 1337 (1936):

"Up to 1919 the manner of making an appropriation was extremely simple; there being two methods which might be followed. The first was the posting of a notice of declaration of intent to appropriate and the filing of such notice in the office of the county recorder of the county in which the point of location was situated. This had to be followed by an actual application of water to the beneficial use contemplated, and the appropriation was not completed until such application had been made, when it became a vested right. The second method was by the mere application of water to a beneficial use, without the posting or recording of any notice whatever, and this right also became vested at the time of application. The only practical difference in the result of the respective methods was that under the first, if the actual application of the water was made within a reasonable time, the right of appropriation dated back to the filing of the notice, while in the second case it took effect only as of the date of actual application." 47 Ariz. at 489, 56 P.2d at 1339.

■ In its findings of fact the court states that since 1910 the cattle on the Battle Axe Ranch have "watered from the various natural water sources in the area" —included in the natural water sources are the waters flowing in Walnut Grove Canyon. Therefore, we conclude in light of the Parker decision, that plaintiff has made a valid appropriation of these waters, even though no notice was posted, by applying these waters to a beneficial use since 1910.

■ In regard to the "retaining wall spring" the court held that plaintiffs had made no valid appropriation on the ground that "prior to 1919 spring waters were not appropriable". In McKenzie v. Moore, 20 Ariz. 1, 176 P. 568 (1918) this Court discussed the question of what waters were appropriable under the 1913 Code:

"Percolating water, unconfined to a definite channel, is not the subject of appropriation, but belongs to the realty. Howard v. Perrin, 200 U.S. 71, 26 S.Ct. 195, 50 L.Ed. 374; 40 Cyc. 704(1) E. 'A spring which does not constitute the source of a watercourse, the flow of its water or surplus being subterranean and concealed and a matter of uncertainty as to direction and volume, belongs to the owner of the land, who may appropriate and use its entire flow.' * *. Certainly a spring of water, as such, is not one of the sources from which water may be appropriated by notice given. Before the party giving notice as provided in chapter 1 of title 55, Revised Statutes of Arizona of 1913, can acquire any right thereby, his claimed appropriation must be of waters of a river, creek, or stream of running water." 20 Ariz. at 5, 176 P. at 569.

And as Justice Alfred C. Lockwood wrote in Fourzan v. Curtis, 43 Ariz. 140, 29 P.2d 722 (1934): "Before 1919, unless a spring rose to the dignity of the source of a running watercourse, its waters were not appropriable at all under our law." 43 Ariz. at 144, 29 P.2d at 724. It seems clear from these two cases that a spring is appropriable if its waters do more than merely ooze or percolate out of the ground, i. e. if its waters form the basis for streams or creeks. Applying this test we hold that the waters of the "retaining wall spring" are appropriable, since it constitutes the source of a watercourse. And, therefore, we hold that, as is the case with the seasonal waters of Walnut Grove Canyon, plaintiff and his predecessors have appropriated this water by putting it to beneficial use prior to 1919.

On the basis of plaintiff's adverse use the court granted them an easement across defendants' mining claims for the purpose of enjoying the waters of Fig Spring. This easement is twenty feet in width and centered on the flow line of the two canyons. The court also held that plain-

tiffs had acquired an easement by prescription across defendants' claims for the purpose of driving their cattle from the Battle Axe Headquarters to the "Northern Range" north of the highway. This easement has the same location as plaintiffs' easement to use Fig Spring.

In LaRue v. Kosich, 66 Ariz. 299, 187 P.2d 642 (1947), we set out the elements necessary to acquire an easement by prescription:

> " 'The burden is upon the party who claims title by prescription to clearly prove by competent evidence all the elements essential to such title. The user must have been adverse to the true owner, and hostile to his title. It must have been actual, continued, open, and under a claim of right. It must have all the elements necessary to acquire title by adverse possession.' " (Emphasis in the original.) 66 Ariz. at 303, 187 P.2d at 645.

In order for plaintiff to acquire these easements by prescription over unenclosed land his use of the land must have been hostile to the defendants. Unless notice of such use, hostile to the owner, is clearly brought home to the true owner, such use will be deemed permissive. New Mexico, a state similar to Arizona in topography, has so held in Hester v. Sawyers, 41 N.M. 497, 71 P.2d 646, 651, 112 A.L.R. 536 (1937):

> "In this state, where large bodies of privately owned land are open and uninclosed, it is a matter of common knowledge that the owners do not object to persons passing over them for their accommodation and convenience, * * *. Under these circumstances it would be against reason and justice to hold that a person so using a way over lands could acquire any permanent right, unless his intention to do so was known to the owner, or so plainly apparent from acts that knowledge should be imputed to him."

See also Le Croy v. Sigman, 209 Ark. 469, 191 S.W.2d 461 (1946); and Du Mez v. Dykstra, 257 Mich. 449, 241 N.W. 182 (1932).

After a full examination of the evidence we hold that defendants' predecessor in interest had notice of the fact that plaintiffs were driving cattle over the mining claims to water at Fig Spring under a claim of right. In 1947 a hearing was held before the State Land Commissioner on plaintiffs' application for water rights in Fig and Walnut Grove Springs. Since defendants' predecessor in interest, one Hughes, attended this hearing he must have received notice that plaintiffs intended to cross defendants' claims for access to water under their water rights.

In regard to the plaintiffs' easement over defendants' claims for the purpose of driving their cattle to the "northern range", we reach a different result. In its conclusion of law the court stated: "The use is intimately connected with the watering of cattle at Fig Springs, as to which a claim of right was clearly brought home to defendants' predecessors in interest in 1947." We are at a loss to understand what alchemy can transform notice of intention to drive cattle across land to water into notice of intention to drive cattle across land to reach other grazing areas. LaRue, *supra*, holds that the burden is on the party claiming title by prescription to prove all the necessary elements. Absent more convincing evidence than defendants' predecessor's attendance at a water right hearing, we believe that plaintiffs have failed to carry the burden of proof on notice to defendant in this matter. We hold, therefore, that plaintiffs' right-of-way is solely for the purpose of watering at Fig Spring and does not extend past the point in Fig Spring Canyon where the cattle may drink these waters; a point found by the court to be 200 feet north of the confluence of Fig Spring and Walnut Grove Canyons.

Plaintiffs attack the portion of the judgment granting the easement for watering as void for indefiniteness on the grounds that it is not clear exactly what part of the mining claim is subject to the easement. On the contrary, we find that the trial judge described the location of this easement with admirable clarity. In the amended judgment of March 8, 1966, the following language appeared:

"(4) That plaintiffs have acquired through adverse use a right-of-way to drive their cattle along the main stream course of WALNUT CREEK as it crosses the WILD COW No. 9 and the SILVER CREEK patented lode mining claims, which said right-of-way is 20 feet in width and centered upon the main stream or flow line of WALNUT CREEK * * *."

With the main channel of Walnut Creek as a benchmark, plaintiffs' charge of indefiniteness is without merit.

Plaintiffs' contention that the easement granted by the trial judge is too narrow to permit their cattle to gain access to the waters of Fig Spring may be easily disposed of. On this point the judge weighed the conflicting testimony and held that twenty feet was an adequate width. We are bound by his findings of fact. Barnett v. Hitching Post Lodge, Inc., *supra*.

Sometime around 1954 plaintiffs constructed on the Silver Creek mining claim a "turnaround" to enable the cattle trucks hauling cattle in and out of the ranch from the old Ray-Superior Highway to make the turn onto the road leading to the headquarters. This "turnaround" was bulldozed out by defendants in the course of their development of the Silver Creek claim. Plaintiffs sought to compel defendants to restore the "turnaround" for the reason that plaintiffs had acquired a right to it by prescriptive use. The court below rejected this argument on the grounds that: (1) plaintiffs had not given the owners of the mining claims notice that they were using the "turnaround" under a claim of right; and (2) plaintiffs had not used the

"turnaround" for the statutory period. We agree with the trial court's conclusions.

As we said in LaRue, *supra*, the burden of proving all the elements of title by prescription is on the party claiming such title. The record is barren of evidence that plaintiffs' use of the "turnaround", situated on unenclosed land, was any more than neighborly accommodation on the part of the mining claim owners. There is no showing that plaintiffs ever asserted any claim of right in such a manner as to alert the owners of the claims as to their intentions.

As one of his findings of fact the judge stated that the "turnaround" was used by plaintiffs from 1954 until it was obliterated by defendants sometime in 1963. Therefore, even if plaintiffs' use could have been shown to be under a claim of right, their attempt to assert title to the "turnaround" by prescription would still fall, because plaintiffs have not used the land for more than ten years. A.R.S. § 12–526.

One consequence of defendants' grading and narrowing of Fig Spring and Walnut Grove Canyons was to increase the depth and velocity of water flowing down the Canyons during periods of heavy rainfall. In order to prevent this increased flow from washing away the sides of the canyons, where defendants had narrowed the channels, and from depositing large amounts of rocks and other loose material in the headquarters area, the trial judge ordered defendants to stabilize both the channel on the Silver Creek claim and a dike, constructed just above the claim, by rip-rapping or any other good engineering practice. Plaintiffs reject this solution, arguing that defendants have wrongfully diverted and interfered with the waters flowing in Walnut Grove Canyon and should be compelled to restore the canyon to its natural state. In support of their position plaintiffs cite A.R.S. § 45–109, subsec. A, par. 6 which makes it a misdemeanor to "* * * divert(s) a stream to the injury or threatened injury of the lands of another."

We stated in an earlier portion of the opinion that the waters flowing in

Walnut Grove Canyon were stream waters. However, it really makes no difference to the determination of this case whether defendants' construction activities which diverted the waters of Walnut Canyon constituted a misdemeanor. If indeed defendants' conduct falls within the statute, the water superintendent in this district, not plaintiffs, must be concerned with that problem. We believe that in light of the court's decree that defendants must take steps, consonant with accepted engineering practices, to stabilize the channel, there will exist no injury or threatened injury to plaintiffs' lands.

However, we do not believe the court's decree in this matter goes far enough. In light of the fact that defendants narrowed Fig Spring as well as Walnut Grove Canyon, the lands leased from the federal government by plaintiffs, situated between the mining claims, are threatened with the same type of flood damage as the headquarters. Therefore, the court's order that the channel be stabilized must be extended to include Fig Spring Canyon and the dike situated in it.

As one of his findings of fact the trial judge found that the dike, built by defendants to change the channel of Walnut Grove Canyon, was situated north of the Silver Creek claim on land held by plaintiffs under a federal grazing lease. Plaintiffs contend that the court erred in allowing defendants to maintain this dike on plaintiffs' leased land. We agree.

■■■ Defendants' argue initially that only the owner of the land where the dike is situated, i. e. the federal government, and not plaintiffs, have standing to compel its removal. Clearly such a contention is without merit. A lessee of real property has standing to sue for damages to his rights of possession caused by a third person. Bauer-Smith Dredging Company v. Tully, 305 S.W.2d 805 (Tex.Civ.App.1957). Defendants further maintain that they have a right to construct this dike to protect their proposed housing developments from flood waters flowing down Walnut Grove Canyon and that plaintiffs have not shown wherein they have been damaged by the construction of this dike. Doubtless defendants can take measures to protect themselves from flooding, but they cannot burden plaintiffs' land with this dike in order to accomplish this purpose. The building of the dike on plaintiffs' leased land is clearly a trespass, and defendants have no right to maintain it in its present location. Defendants' statement that plaintiffs cannot prevail because they have failed to show that they were damaged by construction of the dike is wide of the mark. It is hornbook law that the possessor of land suffers damage from the fact that the trespasser broke his close. Forest City Cotton Co. v. Mills, 218 N.C. 294, 10 S.E.2d 806 (1940).

■■■ Once equity enters into a case it will retain jurisdiction until all differences between the parties are justly settled. Gentry v. Andrews, 79 Ariz. 270, 288 P.2d 487 (1955); Mosher v. Lount, 33 Ariz. 272, 264 P. 98 (1928). As part of this case plaintiffs sought to enjoin defendants from interfering with or destroying Fig Spring. Therefore, exercising our equity jurisdiction in order to afford complete relief, we order that defendants remove the dike in question from plaintiffs' leased land.

Plaintiffs ask us to remand this cause to the trial court in order to ascertain the damages suffered by them as a result of defendants' alleged destruction of Fig Spring. Since we have determined that the record reflects defendants were not responsible for drying up of Fig Spring, there exists no right to damages from them in this regard.

Affirmed in part and reversed in part. The opinions of the Court of Appeals, 8 Ariz.App. 374, 446 P.2d 480 (1968); 8 Ariz.App. 558, 448 P.2d 128 (1968) vacated.

UDALL, C. J., and STRUCKMEYER and HAYS, JJ., concur.

NOTE: Justice ERNEST W. McFARLAND did not participate in the determination of this case.

## APPENDIX

N
W · E
S

Wild Cow #9 Claim

Fig Spring

— dike

Fig Spring Canyon

Walnut Grove Canyon

State Highway #177

— dike

horseshoe "turnaround"

Silver Creek Claim

Retaining Wall Spring

Old Highway

Walnut Grove Spring

Battle Axe Headquarters