662 P.2d 140

Marvin D. COMBS, Plaintiff/Appellant,

v.

Marcellus William DuBOIS and Eva F. DuBois husband and wife, Defendants/Appellees.

No. 2 CA–CIV 4418.

Court of Appeals of Arizona, Division 2.

Dec. 20, 1982.

Rehearing Denied Jan. 31, 1983.

Review Denied Mar. 29, 1983.

Bilby, Shoenhair, Warnock & Dolph, P.C. by David A. Paige, Tucson, for plaintiff/appellant.

Gust, Rosenfeld, Divelbess & Henderson by Michael L. McAllister, Phoenix, for defendants/appellees.

## OPINION

HOWARD, Chief Judge.

The main issue in this case is whether appellees DuBois presented sufficient evidence to show that they had acquired Comb's land by adverse possession.

In 1974 Combs bought 161 acres of vacant land from the estate of Etta Hooker. This property was landlocked, being surrounded by the property owned by appellees DuBois. When DuBois refused to grant Combs an easement of ingress and egress through their property, Combs filed a complaint seeking a private way of necessity pursuant to A.R.S. § 12–1201. Appellee Brush was later brought in as a defendant since part of the proposed easement would traverse his property.

DuBois counterclaimed to quiet title to the 161 acres based on adverse possession. The case was tried to a jury which awarded DuBois $7,981.77 and Brush $193 for the easement granted to Combs. Special interrogatories were submitted to the jury on the adverse possession issue and the jury found against DuBois, finding inter alia, that they had not claimed the 161 acres as their own.

The trial court refused to follow the jury's determination on the adverse possession claim and made its own findings of fact quieting title in DuBois. The verdict on the private way of necessity was thus moot.

Appellant now claims that (1) the trial judge improperly disregarded the jury's findings of fact and (2) there was insufficient evidence to support a claim of adverse possession. We agree with appellant's second contention and reverse.

Marcellus DuBois testified as follows in the trial court. In 1942 his father purchased their ranch property from the Fishers, who together with their predecessors in interest, had been using the Hooker 161 acres for grazing cattle. There were already two dirt tanks, which were no more than hollowed-out areas of the ground, on the 161 acres when DuBois bought the property. When it rained surface water ran into the tanks. Marcellus DuBois asked Fisher about the 161 acres and he told them that the property belonged to the Hooker sisters who refused to lease or sell the property. After purchasing the property Marcellus DuBois wrote several letters to the sisters about selling or leasing the property but no answers were ever received.

From the beginning The DuBois used the property for grazing their cattle as had their predecessors in interest. DuBois periodically removed sand and gravel from the property for construction of water troughs and in 1951 they cleared a path 150 feet wide through a mesquite thicket for a cattle run. Between 1952 and 1955 the silt in the two tanks was cleaned out. In 1954 or 1955 DuBois reseeded part of his own ranch and took some of the seed on horseback scattering the seed on the Hooker property.

In 1954 the Hooker sisters came out to the ranch. We quote from the testimony of Marcellus DuBois on direct examination:

"Q. They came out to the ranch?

A. Yes.

Q. Did they want to look at the Hooker Ranch?

A. Yes. They wanted to go there, and the car they had wouldn't go, so I hauled them over there.

Q. You showed them around.

A. Yeah, I showed them *their* country."

(Emphasis added)

DuBois testified that he wanted to ask the sisters whether they would be willing to sell or lease the 161 acres but they wouldn't

talk to him. They observed that he was grazing cattle on the 161 acres and he said to them, "... well, I'm just going to use it *like it was my own,* and they just nodded their heads, and that's it." (Emphasis added)

Marcellus never told the sisters while they were there that they didn't own the property anymore or that he was claiming that it was his. In fact, in 1963 or 1964 his wife, with his knowledge, wrote the sisters another letter and asked them if they would lease or sell the 161 acres.

After Etta Hooker died, DuBois saw a notice in the newspaper that the estate was selling the 161 acres. DuBois was going to buy the property from the estate but the next thing he knew it had been sold to appellant Marvin B. Combs.

Combs went to see DuBois in 1974 to see whether DuBois would give him an easement of ingress and egress to the 161 acres. DuBois would not agree to give Combs an easement along the route proposed by Combs, but suggested to Combs another route. DuBois also told Combs that he was better off if he sold the 161 acres to him.

On the witness stand DuBois admitted that he never told the Hooker sisters or Combs that he owned the property because he did not have to since he knew he owned it. He also explained why he offered to buy the property from the Hookers and Combs and why he was going to buy it from the estate. His reason was to avoid a lawsuit. DuBois gave no explanation as to why he offered to lease the 161 acres from the Hooker sisters.

The pertinent portions of the trial court's findings of fact and conclusions of law are as follows:

"* * *

4. Defendants DuBois and their predecessors in interest occupied the subject real property purchased by plaintiff continuously since 1922, and held it openly and visibly.

5. The subject real property was used by defendants DuBois and their predecessors for grazing purposes.

6. Said subject property contained two dirt tanks which were periodically improved by defendants DuBois, specifically in 1952 and again in 1962–1963.

7. Defendants DuBois also cleared a path 150' wide through plaintiff's property for a cattle run, removed sand and gravel from said land, fenced a well to prevent cattle from falling into the open hole and seeded the subject land, along with portions of their own land, for grazing grass.

8. Defendants DuBois treated the land as their own, permitting hunting in season and discouraging trespassers at other times.

9. Defendants DuBois attempted to purchase the land from Etta Hooker, plaintiff's predecessor in interest, in the mid 1950's ... When the purchase could not come to fruition, they continued to use the land as their own. However, said defendants attempted to purchase to acquire a paper title thereto.

10. Plaintiff was aware of the defendants DuBois using said premises for grazing purposes and made no objection, and in fact, permitted their use. However, said consent was long after defendants DuBois use of said property, for at least ten years, as their own.

11. Plaintiff and his predecessors paid the taxes on the subject real property.

B. CONCLUSIONS OF LAW:

1. Defendants DuBois and their predecessors in interest exercised dominion over plaintiff's land beyond mere grazing, and claimed said land as their own, openly, notoriously, visibly, hostilely, exclusively, continuously and uninterrupted since 1922, a period in excess of ten years.

2. Defendants DuBois and their predecessors in interest used said land under a claim of right and without permission for the requisite period of time as set forth in A.R.S. 12–526.

3. Defendants DuBois are therefore entitled to judgment on their counterclaim, seeking title to be quieted in them, and against the plaintiff such that the

plaintiff is divested of any interest in the subject real property and the defendants are declared to be the true owners of the subject real property by adverse possession."

Appellant first contends that the trial court improperly disregarded the factual finding by the jury. We do not agree. The jury in this case was an advisory one, constituted pursuant to Rule 39(k), Arizona Rules of Civil Procedure, 16 A.R.S. A quiet title action is one of equitable cognizance. *Chantler v. Wood*, 6 Ariz.App. 134, 430 P.2d 713 (1967), supplemented 6 Ariz.App. 325, 432 P.2d 469 (1967). Rule 39(*1*) provides that in an action where equitable relief is sought the answers made by the jury to special interrogatories shall be advisory only. Appellant points to 2A C.J.S., Adverse Possession, § 302 which states in effect, that questions of fact in an adverse possession case are for the trier of fact and that the trial court should leave the resolution of conflicting facts to the jury. A reading of the cases cited by the treatise upon which it bases its statement, shows that the legal proposition set forth applies to actions such as trespass and ejectment which are actions at law and not actions in equity.

The trial court made its own findings of fact pursuant to Rule 52, Arizona Rules of Civil Procedure, 16 A.R.S. We are bound by the trial court's findings of fact unless they are demonstrated to be clearly erroneous. *Olson v. State*, 12 Ariz.App. 105, 467 P.2d 945 (1970). We are not bound by the trial court's conclusions of law. *Park Central Development Company v. Roberts Dry Goods, Inc.*, 11 Ariz.App. 58, 461 P.2d 702 (1969).

With the foregoing in mind, we first turn to the general law pertaining to adverse possession. The burden of proof is upon the person claiming title by adverse possession to show that the requisite elements thereof have been satisfied and there are no equities favoring the establishment of a claim. *Tenney v. Luplow*, 103 Ariz. 363, 442 P.2d 107 (1968); *Fritts v. Ericson*, 87 Ariz. 227, 230, 349 P.2d 1107, 1109 (1960).

The evidence must show that his possession was under a claim of right inconsistent with a claim of anyone holding the paper title, for possession without some pretense or claim of right is not adverse. *Tenney v. Luplow*, supra. The possession that will give an occupant title against the true owner must be hostile. *Mosher v. Arizona Packing Co.*, 25 Ariz. 473, 219 P. 232 (1923); *Rorebeck v. Criste*, 1 Ariz.App. 1, 398 P.2d 678 (1965). The term hostile means that the claimant is in possession claiming as the owner in contra distinction to holding in recognition of, or insubordination to, the true owner. *Rorebeck v. Criste*, supra; *Gusheroski v. Lewis*, 64 Ariz. 192, 167 P.2d 390 (1946). Where the occupant of the land acknowledges or recognizes the title of the real owner and does it before the statutory period has run, he thereby shows that his possession is not adverse. *Birtrong v. Coronado Building Corporation*, 90 N.M. 670, 568 P.2d 196 (1977) and limitations will not begin running against the owner unless and until the claimant thereafter repudiates his title. *Shirey v. Whitlow*, 80 Ark. 444, 97 S.W. 444 (1906). The doctrine of adverse possession does not apply to cases in which possession is permissive. *Spillsbury v. School District No. 19*, 37 Ariz. 43, 288 P. 1027 (1930). This is so even though permissive possession is long continued, *Scott v. Elliott*, 253 Ore. 168, 451 P.2d 474 (1969) and even if it is exclusive. *Loewenberg v. Wallace*, 151 Conn. 355, 197 A.2d 634 (1964).

Of special importance in this case is the law in Arizona regarding the grazing of cattle on unenclosed land. In the case of *England v. Ally Ong Hing*, 105 Ariz. 65, 459 P.2d 498 (1969) the court, following the law of Texas and in particular the law set forth in *De Las Fuentes v. Macdonell*, 85 Tex. 132, 20 S.W. 43 (1892), held: "... [T]he mere grazing of cattle, absent any other acts of dominion over the land, will not support a claim to land based on adverse possession." 20 S.W. at 69.

What would be an "act of dominion" which would, in addition to the grazing, support a claim of adverse possession? In *England v. Ally Ong Hing*, supra, the court

sets forth the following quote from *De Las Fuentes:*

"'* * *

We * * * indicate the rule in this court to be that the mere occupancy of land by grazing livestock upon it, without *substantial inclosures* or other *permanent improvements,* is not sufficient to support a plea of limitation under our statutes....'"

We can thus conclude that permanent improvements or substantial enclosures coupled with the grazing would suffice for a claim of adverse possession.

We now turn our attention to the court's findings of fact. First it is important to note that the facts which we have recited were facts that came from testimony of appellees. The court's findings of fact omit or ignore critical testimony given by appellees. Furthermore, finding of fact No. 9 is clearly erroneous when it states that the "... defendants attempted to purchase to acquire a paper title thereto." In addition, the court's conclusions of law Nos. 1 and 2 are not supported by the findings of fact nor by the uncontradicted testimony of appellees themselves.

Prior to the purchase by the DuBois family of the land in 1942, the evidence was that the land was used for grazing and that there were two dirt tanks on it. Under the law set forth in *England v. Ally Ong Hing,* supra, and *De Las Fuentes,* there could be no claim of adverse possession from the grazing nor the scooping out of dirt tanks. In fact, when Fisher sold the land to DuBois in 1942 he did not indicate to them that he, Fisher, was claiming the land was his. He told DuBois that the property belonged to the Hooker sisters and that they would not sell or lease it. From 1942 to 1954 the only acts on the property which could be remotely considered as an act of dominion, and we do not now decide whether it was or not, was the clearing of the cattle run in 1951 or 1952. Furthermore, the occasional picking of gravel from the property cannot support a claim for actual possession of the land itself. *Proprietors of Jeffries Neck Pasture v. Inhabitants of Ips-*

*wich,* 153 Mass. 42, 26 N.E. 239 (1891). Assuming arguendo that the clearing of the cattle run "unfurled the flag" and constituted an act of dominion over the property, such hostility came to an end in 1954 when the Hooker sisters came out to the property. That time Marcellus DuBois testified that he showed the Hooker sisters "their country." Perhaps the use of this phrase was a slip of the tongue but perhaps it was not in view of the other matters he testified to. Was he claiming the land hostilely at that time? His testimony shows otherwise. He stated from the witness stand that at that time he intended to ask the sisters if they would sell or *lease.* He told the sisters that he was going to use the land *like* he was the owner, not because he was the owner or as the owner. He also testified that when the sisters heard this they nodded their heads. We believe the evidence clearly shows that his use of the land "like the owner" from 1954 on was permissive. The DuBois wrote more than one letter to the Hooker sisters asking if they could lease or buy the 161 acres. The last of these letters was sent to the sisters in 1963 or 1964.

█ The cases vary as to the effect given an offer by the claimant to purchase the property. In Texas, whence our statutes on adverse possession are derived, the courts hold that the admission or recognition of another's title before the completion of the limitation period, which precludes hostility of possession of the claimant, may be shown by the claimant's attempt to purchase another's interest. *Hatton v. Burgess,* 167 S.W.2d 260 (Tex.Civ.App.1942). Whether the attempt to purchase the title is such a recognition is a question of fact to be decided by the intention of the parties as disclosed by what was said by the parties and by the circumstances surrounding the transaction. *Bruni v. Vidaurri,* 140 Tex. 138, 166 S.W.2d 81 (1942). See also *Sanderson v. McManus,* 252 S.W.2d 351 (Mo.1952); *Eddy v. Clayton,* 44 So.2d 395 (Miss.1950); *Hollowell v. Borchers,* 150 Neb. 322, 34 N.W.2d 404 (1948); *Terral v. Brooks,* 194 Ark. 311, 108 S.W.2d 489 (1937); 2 C.J.S. Adverse Possession § 78; 125 A.L.R. Adverse Possession 825.

In Alabama, efforts to obtain deeds from other claimants to the property do not disprove the adverse nature of possession, but efforts to buy the property from the record owner constitute acknowledgement of his superior title and thus do disprove the adverse nature since there is then no claim of right. *Kerlin v. Tensaw Land & Timber Co., Inc.,* 390 So.2d 616 (Ala.1980).

Other cases hold that the claimant has the right to "buy his peace" and his offer to purchase the property does not admit to the superiority of title sought to be purchased. See *Richterberg v. Wittich Memorial Church,* 222 F.Supp. 324, (W.D.Okl.1963), cert. den. 379 U.S. 1000, 85 S.Ct. 719, 13 L.Ed.2d 702 (1965), aff'd *Christ Church Pentecostal v. Richterberg,* 334 F.2d 869 (10th Cir.1964); *Fife v. Barnard,* 186 F.2d 655 (10th Cir.1951); *Macias v. Guymon Ind. Foundation,* 595 P.2d 430 (Okl.1979); *Hurie v. Quigg,* 121 Okl. 80, 247 P. 677 (1926); and see 2 C.J.S. Adverse Possession § 78, p. 758, fn. 19; 3 Am.Jur.2d Adverse Possession § 85.

 New Mexico holds that in the absence of any evidence of a contrary intent, the offer to purchase the property from the legal owner does not constitute acknowledgement of a superior title. *Brylinski v. Cooper,* 95 N.M. 580, 624 P.2d 522 (1981). Here we have evidence of a contrary intent. DuBois not only offered to purchase the property but offered to lease it. Had appellees been successful in actually leasing the property it is clear that the acceptance of the lease would constitute an acknowledgement of the subordination of their interest to the true owner. See *Lewis v. Idones,* 280 App.Div. 980, 116 N.Y.S.2d 382 (1952). We do not believe an offer to lease the property is any less of a recognition of the superiority of the landowner's title than an actual acceptance of the lease. We do not rest on this principle alone. Appellees' offer to lease or buy the property clearly demonstrates that appellees were not merely trying to "buy their peace" but in fact recognized that their claim, if any, was subordinate to that of the true owners of the property. From the time appellees' intention to ask the Hooker sisters if they could lease the property when they came on the land up to the time that DuBois discussed the purchase of the property from Combs, their possession of the property was not hostile. Not only did DuBois attempt to buy the property from Combs, but DuBois suggested that he take another route to get into the property, a clear indication that even at that late date, DuBois was not holding the property hostilely.

The trial court's judgment quieting title in the DuBois is vacated and set aside and the case is remanded to the trial court with directions that it enter judgment on appellant's claim for a private way of necessity according to the verdict rendered by the jury.

HATHAWAY and BIRDSALL, JJ., concur.