881 P.2d 1182

**Robert BERRYHILL and Alberta Berryhill, husband and wife, Plaintiffs–Appellees,**

v.

**Robert R. MOORE, a single man, Jim R. Jackson and Patsey J. Jackson, husband and wife, Defendants–Appellants.**

**No. 1 CA–CV 92–0433.**

Court of Appeals of Arizona, Division 1, Department E.

Aug. 2, 1994.

As Corrected on Grant of Reconsideration in Part Oct. 3, 1994.

Musgrove & Drutz, P.C. by James B. Musgrove, Grant K. McGregor, Prescott, for plaintiffs-appellees.

Favour, Moore, Wilhelmsen, Payette & Schuyler, P.A. by John M. Favour, Prescott, for defendant-appellant Moore.

Gerald E. Kriehn, Phoenix, for defendants-appellants Jacksons.

## OPINION

CONTRERAS, Judge.

In this adverse possession action, the defendants Robert R. Moore ("Moore") and Jim R. and Patsey Jackson ("Jacksons") appeal from the trial court's judgment in favor of plaintiffs Robert and Alberta Berryhill ("Berryhill" or "Berryhills"). Following a bench trial, the trial court entered judgment which quieted title in the Berryhills as to the entire disputed property, and extinguished the Jacksons' liens on the disputed strip of property. It also awarded the Berryhills their attorney's fees.

In their appeal, Moore and the Jacksons contend that the Berryhills failed to prove that all of the elements necessary for a claim of adverse possession had been satisfied for the statutory period of time. Additionally, the Jacksons contend that even if the Berryhills proved adverse possession against the owner's title, the Jacksons' lien rights cannot be barred. We affirm the trial court's judgment for the Berryhills, except as it pertains to that portion of the disputed real property which became part of the riverbed, and we remand to the trial court to determine the correct legal description. We reverse the trial court's judgment extinguishing the Jacksons' lien rights because, as mortgagees, the Jacksons had no right to immediate possession and accordingly, the statutory period for adverse possession did not begin to run as to them.

### FACTS

The two adjoining 2½ acre parcels of land in dispute were formerly part of a five-acre tract of land near Black Canyon City. Susan Hittson and Cynthia Myers acquired this property in 1973. The five-acre parcel was fenced on all four sides. The Agua Fria River bordered the western edge of the property and Ta–Do–Hoya Trail lay along the eastern boundary. Squaw Valley Road bor-dered the land to the south. Hittson and Myers decided to divide the tract of land into two 2½ acre parcels and sell them. Sam and Myra Fleming, realtors who lived near the property, served as their real estate agents. In April of 1976, the Jacksons, who were friends of the Flemings, purchased the west half of the five-acre tract.

Sam Fleming showed Jim Jackson what he understood to be the boundaries of the west parcel. Based on this information, Jackson constructed a north-south fence on what he believed to be his eastern boundary in order to separate his parcel from the one to the east. In reality, Fleming gave Jackson incorrect information about the boundary, and Jackson consequently constructed the fence approximately 60 feet west of his eastern boundary. As a result of this error, Jackson fenced out a strip of his own property measuring approximately 60 feet wide and 330 feet long. The Jacksons were never aware of this error the entire time that they owned the property. After fencing the property, which never contained any improvements, the Jacksons made no renovations to it and, in fact, rarely even visited the property.

Fleming had been grazing cattle on the entire five-acre parcel with Hittson and Myers' permission when Jackson first looked at the property. After Jackson purchased the west parcel, he gave Fleming permission to continue grazing on the Jacksons' side of the fence, and Jackson installed a gate in the newly-constructed fence so that the cattle could be moved between the two parcels.

In December of 1977, Malcom McCarter and his wife purchased the east parcel. Mr. McCarter walked the property with Myra Fleming, and she represented the fences surrounding the property, including the fence built by Jackson, as being the boundaries of the east parcel. Mr. McCarter believed he was purchasing all of the property lying within the boundary fences.

At the time of the McCarters' purchase, the east parcel contained a house, a barn, a sprinkler system, a well and pressure tank, some interior fencing separating the residential property on the east side from the pasture on the west side, and a livestock water-

ing trough. None of these improvements was located on the disputed strip of property, but water from the sprinklers spread to that area.

The McCarters purchased the property with the intention of using it as a retirement home in the future. Meanwhile, they had little contact with the property other than to stay overnight on it when they parked their motor home there, approximately once a month. The McCarters made arrangements with the Flemings to take care of the property for them by maintaining the sprinklers, watering the property, and keeping the weeds trimmed. The McCarters allowed the Flemings to pasture horses on the whole west side of the property as a means of keeping down the weeds.

In December of 1978, the Agua Fria River flooded, and the river cut a new channel across the Jacksons' parcel in a southwesterly direction, washing away a good portion of their land. The land in the path of the river and all fences upon it fell into the river, leaving a ten foot embankment above the river bed at the edge of the new cut. The river also cut away some of the land on McCarters' side of the fence, specifically that in the extreme northwest corner of the property, which was part of the land situated within the disputed strip. The fences in this corner of the property fell into the river. Except for this one area, though, the fences around the McCarter parcel remained standing and secure.[1]

After the flood did its damage, Mr. McCarter and his wife lost interest in keeping their parcel for their retirement. They eventually sold it to the Berryhills in April of 1981. During the period of time between the flood and the sale of the property, the McCarters never restored the portion of the fence that had washed away. For a good part of that time, they could not have replaced the fence because they had to wait for the appropriate government agency to build back the corner section of the land which the flooding river had cut away.

It was also during this period of time that the Flemings became McCarters' tenants.

The Flemings' house had washed away during the flood. Pursuant to an oral agreement between them, the McCarters let the Flemings stay in the McCarter house located on the property, and the Flemings paid the McCarters the $100.00 per month assistance money that the state gave them due to their flood loss. The Flemings agreed that they would continue to look after the whole parcel of property for the McCarters. The McCarters no longer made their monthly trips to the property out of respect for the Flemings' privacy while they lived on the property.

The Flemings, and later their daughter, remained on the property until a couple of months before the McCarters sold it. During this time, the Flemings brought some livestock onto the property and maintained the cattle openly and visibly on the disputed portion of the property. The Flemings kept the animals they had on the property tethered so that the animals would not wander through to the unfenced portion of the property. Although Mr. McCarter knew that the Flemings had moved their horses off the property the day of the flood, he never knew that they returned livestock to the property.

When McCarters sold the property to the Berryhills, the Flemings once again were the realtors who showed the property and confirmed that the long section of fence which remained standing on the west side of the property marked the proper boundary between the two parcels. The Berryhills, like the McCarters before them, purchased the property with the mistaken belief that they were buying everything within the perimeter fences.

Within a month after purchasing the east parcel, the Berryhills' son moved onto the property. He constructed a temporary fence in the northwest corner so that the property was completely enclosed once again. By that time, the land apparently had been restored by the appropriate government agency so that it had become possible to fence it. The following year, the Berryhills tore down the old fence dividing the parcels, replaced it with a new one two feet to the east and

---

1. Two property sketches are appended to this decision. One is a property sketch before the flood. The second is a property sketch after the flood.

planted trees along the old fence line. A neighboring landowner verified that the new fence appeared to be approximately where the old one had been.

In April of 1985, the Jacksons sold the west parcel to Robert Moore, taking back a promissory note secured by a deed of trust which they recorded against the property. By that time, much of the land on the west parcel which had been lost in the flood had been restored. Moore took possession of the parcel and began making use of it immediately. For the first few years, Moore accepted the Berryhills' word that the fence and the trees between the two parcels marked the proper boundary. Indeed, Moore had made this assumption himself at the time he bought the property. In May of 1988, though, Moore had a survey done which showed that the true boundary line between the two parcels lay approximately 60 feet to the east inside the property claimed by the Berryhills. The Berryhills commissioned their own survey which confirmed the results of Moore's survey.

The Berryhills filed a quiet title action in March of 1989 (approximately eight years after purchasing the east parcel) to establish their ownership by adverse possession of the entire strip of land to which Moore held title and upon which the Jacksons, who formerly held legal title, claimed a recorded lien. Moore and the Jacksons filed counterclaims, Moore seeking to quiet title and the Jacksons seeking to uphold their lien rights in the property. The Berryhills tendered a quitclaim deed to the defendants, and defendant Moore tendered a quitclaim deed to the Berryhills, all pursuant to Ariz.Rev.Stat.Ann. ("A.R.S.") section 12–1103(B).

After a bench trial, the trial court quieted title to the disputed property in the Berryhills, dismissed the counterclaim of the Jacksons, and awarded the Berryhills attorney's fees. Neither party requested findings of fact and the trial court did not make any.

This appeal followed.[2] We have jurisdiction pursuant to A.R.S. section 12–120.21(A)(1).

## STANDARD OF REVIEW

Since neither party requested the trial court to make findings of fact and conclusions of law pursuant to Rule 52(a) of the Arizona Rules of Civil Procedure, this court on appeal must presume that the trial court found every fact necessary to support the judgment. The judgment must be sustained if any reasonable construction of the evidence justifies it. *Neal v. Neal,* 116 Ariz. 590, 592, 570 P.2d 758, 760 (1977); *Ziggy's Opportunities, Inc. v. I–10 Industrial Park Developers,* 152 Ariz. 104, 106–07, 730 P.2d 281, 283–84 (App.1986).

## ADVERSE POSSESSION AGAINST THE TITLE HOLDER

The elements of adverse possession are an actual and visible appropriation of land commenced and continued under a claim of right inconsistent with and hostile to the claim of another for a period of 10 years. A.R.S. §§ 12–521, 12–526(A); *see Ziggy's,* 152 Ariz. at 107, 730 P.2d at 284. The person claiming title by adverse possession shoulders the burden of proof and must show that the requisite statutory elements have been satisfied. *Tenney v. Luplow,* 103 Ariz. 363, 366, 442 P.2d 107, 110 (1968). There are no equities favoring establishment of an adverse possession claim. *Combs v. DuBois,* 135 Ariz. 465, 468, 662 P.2d 140, 143 (App.1982).

At the outset, we note that the defendants do not contend that adverse possession cannot be proven where claimants have possessed the property under a mistaken belief that it is their own. It is well-settled in Arizona that such a mistake of fact does not defeat the claim. The Arizona Supreme Court laid down the applicable law when it stated:

**2.** In their answering brief, the Berryhills complain that Moore and the Jacksons violated Rule 13(f) of the Arizona Rules of Civil Appellate Procedure by filing separate briefs when there is some overlap to their arguments. We point out that the Berryhills could have filed a motion to strike the briefs or portions of them if they felt

they were entitled to such relief. Moreover, the provisions of the rule are not absolute and we are satisfied in this instance that the appellants have not attempted to circumvent the rule by filing separate briefs. Only a small portion of the Jacksons' briefs deal with the issues raised in Moore's briefs.

Where a person, acting under a mistake as to the true boundary line between his land and that of another, takes possession of land of another believing it to be his own, up to a mistaken line, claims title to it and so holds, the holding is adverse and, if continued for the requisite period, will give title by adverse possession. And the fact that on taking possession he had no intention of taking what did not belong to him, or claimed that he had no desire or intention to take any land belonging to the adjoining owner, or that he would have surrendered possession if he had known that the land in dispute was not within the calls of his deed, or that the owner of the record title was ignorant of the location of the true boundary line or of the fact that the land was his, or supposed that the adverse occupant intended to claim only what he actually owned, or the fact that both owners were mistaken as to the true boundary line, does not affect the operation of the rule.... In all cases the intention and not the mistake is the test by which the character of the possession is determined, it being *prima facie* sufficient that actual, visible, and exclusive possession is taken under a claim of right without reference to the fact that the possession was based on mistake.

*Trevillian v. Rais,* 40 Ariz. 42, 45–46, 9 P.2d 402, 403 (1932) (citing 2 C.J. 141 § 245) (ellipses in original). It is beyond dispute that the Berryhills adversely possessed the land from the time they purchased the property in April of 1981, restored the fence, and took possession of the property. However, because they acquired the property only eight years before they instituted this quiet title action, the Berryhills, in order to meet the requisite statutory term of ten years, must prove that they are entitled to tack on a portion of the preceding period of time after the flood had occurred and the Flemings were in possession of the property as the McCarters' tenants.

Because "tacking" is only allowed where there is privity of estate between the successive users, *see* A.R.S. section 12–521(B), we must determine whether there was privity between the McCarters and the Flemings as to the disputed strip of property during the time that the Flemings were the McCarters' tenants after the flood. McCarters were in privity of estate with the Berryhills, but the Flemings were the only ones making use of the property during the post-flood period. It is necessary, therefore, that the evidence demonstrate that the McCarters authorized the Flemings to make adverse use of the disputed strip of property during their tenancy.

It is well settled that when a tenant's adverse use is within the terms of his tenancy, it inures to the benefit of his landlord, but if a tenant initiates an adverse use that is not within the terms of his tenancy, the use remains a trespass and will not ripen into a prescriptive right no matter how long it continues. *Ammer v. Arizona Water Company,* 169 Ariz. 205, 210, 818 P.2d 190, 195 (App.1991). It is not necessary that the property be described in a written lease, but, at a minimum, there must be an agreement or understanding on the part of the tenant to continue adverse possession of the unleased parcel on behalf of the landlord. *Cheatham v. Vanderwey,* 18 Ariz.App. 35, 39, 499 P.2d 986, 990 (1972). It is not enough to show that the landlord would have been willing to let the tenant use the disputed property; there must be an understanding that the tenant will, in fact, use it. *Cf. id.* at 38, 499 P.2d at 989.

The record contains evidence that the Flemings made use of the disputed strip of property, except for the part that dropped into the river, during this critical time period. Their most open and visible use was the grazing of a few farm animals upon it. The defendants argue that the Flemings were not in privity with the McCarters in making this use because the tenancy agreement between the McCarters and the Flemings pertained solely to the Flemings' use of the house. Moore and Jacksons argue that even if the McCarters would have permitted the Flemings to use the rest of the property including the disputed strip, their agreement did not require them to do so. The defendants further urge that the Flemings' pasturing of animals on the property was unauthorized and therefore could not be considered as an

adverse use of the property in privity with the McCarters.

We do not agree with the defendants' characterization of the evidence. Although the Flemings' rent may have been linked primarily to the use of the house, Mr. McCarter testified that he turned the entire property over to the Flemings with the understanding they would continue watering and controlling the weeds. His testimony that he discontinued his monthly trips to the property out of respect for their privacy while they used the property he had turned over to them further supports his testimony that such an agreement existed. The record does not indicate that the grazing animals were removed at the direction of McCarter, and although McCarter stated that he did not know the Flemings had returned the grazing animals to the property, there is also no indication that he felt this act violated the tenancy agreement. He also testified that the Flemings continued the watering and the weed control as they had before the flood. We believe it was enough that Mr. McCarter generally expected the Flemings to take care of the entire disputed strip; it was not necessary that they lay out the specific details. Again, since neither party requested findings of fact and conclusions of law, this court presumes the trial court found every fact necessary to support the judgment which will be sustained if any construction of the evidence justifies it. *Neal,* 116 Ariz. at 592, 570 P.2d at 760; *Ziggy's,* 152 Ariz. at 106–07, 730 P.2d at 283–84. Accordingly, we conclude that the Berryhills presented sufficient evidence to prove that privity of estate existed between the Flemings and the McCarters.

The defendants contend that the Flemings' occupancy and use of the property after the flood and before the sale to the Berryhills was not sufficient to establish that the disputed property was adversely possessed during those years. Specifically, because part of the fence in the northwest corner was down for a period of time, the defendants point out that "enclosure" cannot be relied upon here as the only element necessary to prove adverse use. As a general rule, enclosure coupled with the claimant's mere general use of property within the en-

closure is sufficient to prove adverse possession without requiring proof of other specific acts that would "fly the flag" over the disputed land, but only if the enclosure is complete. *See, e.g., Whittemore v. Amator,* 148 Ariz. 173, 175, 713 P.2d 1231, 1233 (1986); *Knapp v. Wise,* 122 Ariz. 327, 329, 594 P.2d 1023, 1025 (App.1979). In the present case, although there was complete enclosure prior to the flood and complete enclosure after the Berryhills purchased from the McCarters, there was an intervening period of two years following the flood when the fence remained down in the one corner.

In *Overson v. Cowley,* 136 Ariz. 60, 66, 664 P.2d 210, 216 (App.1982), this court stated that an area of land will still be considered enclosed where a fence torn down by the elements or vandalism is restored within a reasonable time. We also said that "[w]hat is reasonable depends on all the facts and circumstances, bearing in mind that the ultimate fact issue is whether the possession was under claim of right and exclusive and the owner was aware or should have been aware of it." *Id.* In *Overson,* 136 Ariz. at 67, 664 P.2d at 217, we cited with approval the case of *Kelly v. Wilson,* 283 S.W. 696 (Tex.Civ. App.1926), which held that continuity of possession was not broken where a fence washed away by a flood was not rebuilt immediately. The Berryhills suggest that it is possible to find in this case that the fence destroyed by the flood was restored within a reasonable time since it was impossible to restore it to its original location until the land which collapsed into the river was built back up by the government agency assigned to do the job. However, a gap in the evidence prevents us from reaching this conclusion. Mr. McCarter testified that he believed the land had not been restored until after the sale to the Berryhills. The Berryhills established that the restoration had occurred by the time they were looking at the property to consider buying it. Mr. McCarter stated that he stopped visiting his property during this time period. From this evidence, it is impossible to determine when the land was restored and how much time elapsed thereafter before the Berryhills replaced the fence. Therefore, other acts of occupancy and use must be

shown in this case in order to support adverse possession.

The acts necessary for adverse possession vary and depend upon the circumstances of each case. *Spillsbury v. School District No. 19 of Maricopa County,* 37 Ariz. 43, 48, 288 P. 1027, 1029 (1930); *Walter v. Northern Arizona Title Company,* 6 Ariz. App. 506, 510, 433 P.2d 998, 1002 (1967). The main use of the disputed strip of land during this time period was for the grazing of farm animals. There was abundant evidence that the Flemings kept farm animals on the property on a regular basis throughout this period.

In *England v. Ally Ong Hing,* 105 Ariz. 65, 69, 459 P.2d 498, 502 (1969), our supreme court held that the mere grazing of cattle over unenclosed land will not support a claim to land based on adverse possession and that other acts of dominion over the land must accompany the claim. In *England,* however, the court was talking about cattle which were left free to roam at will. In this case, the animals were tethered so they had to stay on this specific property and could not roam onto other property. We find that this fact takes the case out of the rule referred to in *England.* Moreover, testimony that the disputed strip of land was watered with sprinklers positioned to reach that area is also persuasive. Accordingly, we are satisfied that the Berryhills demonstrated sufficient use and occupancy of the disputed land during the period following the flood.

This brings us to another of the defendants' contentions that the Flemings did not make exclusive use of the whole disputed strip of property during this period. The defendants point to testimony in the record that cattle could have wandered onto the disputed property because of the hole in the fence. Although there was testimony that cattle may have wandered onto the portion of the property that collapsed into the river bed and, at a later date, it may have been possible for cattle to wander through the hole in the fence after the property was all one level again, this testimony was merely hypothetical. None of the witnesses had seen stray cattle coming through the enclosure. Moreover, as to the disputed strip

untouched by the flood, we agree that when cattle belonging to other persons occasionally stray onto the tract and have not been placed there under a claim of right, the possession of the tract of land is not interrupted. *Fadem v. Kimball,* 612 P.2d 287, 291 (Okla.App. 1979).

Finally, the defendants argue that since both the Jacksons and McCarters had given the Flemings permission to graze animals on their respective lands, it cannot be determined whose permission actually applied to the disputed strip of property. They argue that the situation is like the one addressed in *Ziggy's,* 152 Ariz. at 108, 730 P.2d at 285, where a tenant farmer worked the disputed parcel for both the record title owner and the owner of the adjoining land who claimed adverse possession through the tenant farmer. The *Ziggy's* court held that the claimant could not tack the period of possession by the common tenant under those circumstances. *Id.* at 109, 730 P.2d at 286.

We find that there is a critical difference between the situation in the present case and that in *Ziggy's.* In this case, the evidence shows that although the Jacksons actually held title to the disputed strip of property, they believed that the property belonged to the McCarters. Therefore, the Jacksons were fully aware that the Flemings' use of any disputed property on the east side of the fence was pursuant to the Flemings' arrangements with the McCarters and was not pursuant to the Jacksons' authority. In *Ziggy's* there was no evidence that the tenant was adversely possessing the disputed parcel on behalf of the adverse claimant, nor was there evidence that the record owner of the disputed parcel had notice to that effect.

The defendants next argue that even if the facts support this conclusion as to part of the disputed land, the Berryhills cannot establish adverse possession in the portion of the land which collapsed into the river and, after the river receded, lay ten feet below the remaining property until restored by government agencies. They point out that the Flemings made no use of this land, and they cite to *Fritts v. Ericson,* 87 Ariz. 227, 230, 349 P.2d 1107, 1108 (1960) *appeal on re-*

*mand,* 103 Ariz. 33, 436 P.2d 582 (1968), as requiring the claimant to show adverse possession of the "very land in question." We agree. The Flemings' possession of the river bottom property was neither actual nor exclusive. In addition to a continued physical presence on the land, the presence of fencing or the use of the land as pasture is further indicia of actuality of possession. *Edmonds v. Thurman,* 808 S.W.2d 408, 410 (Mo.App. 1991). The Flemings did not use the river bottom as a pasture, and their livestock at all times was attached to tethers. There is no evidence that the Flemings maintained the river bottom property, controlled vegetation there, pastured their animals there, fenced the property or otherwise marked the boundaries. Thus, we conclude that the Flemings did not actually possess the river bottom during the disputed two year period, and the Berryhills cannot now tack on this period to their adverse possession claim. *Compare Turner v. Valentine,* 570 So.2d 1327 (Fla. App.1990), *review denied,* 576 So.2d 294 (Fla. 1991) (claimants established ownership by adverse possession to strip of land formed when creek changed course by actually using the disputed strip as part of backyard in good faith belief that they owned it.).

■ Nor can we find that the Flemings' use of the river bottom property was exclusive. The intent to take actual control of open range, and hence "wild and undeveloped" land, requires a lesser exercise of actual ownership by affirmative act than does the intent with regard to other property, but this intent must be more than a "mere mental enclosure." *Edmonds,* 808 S.W.2d at 410–11. An adverse possession must not only be against the true owner, it must be "against the world." *Rorebeck v. Criste,* 1 Ariz.App. 1, 4, 398 P.2d 678, 681 (1965). Moreover, acts which properly state a cause of action for adverse possession on a certain area of unenclosed land may not be imputed elsewhere; the adverse activity must take place on the land in question. *Rogers v. House,* 6 Ariz.App. 582, 584, 435 P.2d 492, 494 (1967).

Witnesses testified that after the flood, the area of the river bottom became open range, and livestock not owned by the Flemings were present on this land. A ten-foot embankment "set-off" the river bottom property from the remainder of the disputed strip, and the Flemings' portion of the river bottom was not fenced to prevent others from entering. Through an act of nature, the Flemings, as adverse possessors on behalf of McCarters, were "constructively dispossessed" of the river bottom property. The Flemings' intent to possess the disputed strip seemingly ends at the embankment, and we do not find any evidence from which it may be inferred that the Flemings made any attempt to "fly their flag" over the river bottom property during the period in question sufficient for us to find that they intended to exclude others therefrom. Flemings' use of the river bottom land from the time of the flood until the time it was reconstructed was therefore not exclusive, did not inure to the McCarters, and the Berryhills may not "tack" on such time to their adverse possession claim. *See Edmonds,* 808 S.W.2d at 410 (claimant's claim of adverse possession for area frequented as a "swimming hole" failed for want of intent to exclude others, despite testimony that claimant had, on occasion, attempted to control unlawful activity near swimming hole, but did not object generally to the use of the swimming hole by others.). The flood's creation of a ten-foot embankment, coupled with the destruction of the corner fences, makes this holding unique to these facts and removes this case from the general rule announced in *Overson.* Had the land remained evenly level and only the fence been destroyed, the result might have been different, but the natural creation of two types of property separated by a large natural barrier where only one type of land had existed before requires a separate intent to possess and exclude others from the newly set aside portion. This element of adverse possession cannot be inferred from activity which occurred on the intact strip.

For all of the foregoing reasons, we conclude that the plaintiffs proved all of the elements necessary to support a claim of adverse possession in the disputed strip for the statutory period of time, except as to that portion of the land converted to river bottom property by the flood of 1978.

The defendants argue that the legal description contained in the amended judgment as to the property adversely possessed by the Berryhills is not correct because it contains the portion of the property that fell into the river during the flood. Specifically, the defendants contend that the trial court heard no testimony from which it could determine the legal description of the portion of the disputed property which remained intact after the flood.

We agree that a new description of the property is necessary in light of our holding that the Berryhills by adverse possession acquired title only to that portion of the disputed strip remaining intact after the flood of 1978. The judgment as to the river bottom property is reversed and remanded to the trial court with directions to set forth a corrected accurate legal description for the property. We are cognizant of the Arizona Supreme Court's pronouncement in *Fritts*, 87 Ariz. at 232, 349 P.2d at 1110, to avoid vague legal descriptions that would "require the services of a detective or an Indian scout rather than a surveyor to locate them." *Id.* To that end, on remand the trial court shall, if necessary, take testimony regarding the exact location of the embankment after the 1978 flood and then, if necessary, order a competent survey. The judgment shall be amended accordingly.

## ADVERSE POSSESSION AGAINST THE LIEN HOLDER

■ This case also requires us to decide the issue of whether the Berryhills are entitled to quiet title extinguishing the Jacksons' lien rights based on their claim of adverse possession. Although the Arizona courts have frequently dealt with adverse possession claims in reported cases, we have found none in Arizona touching on the subject of how lien rights are affected by a claim of adverse possession.

We have not been cited any recent cases in which the issue has been discussed. We note that the courts which have faced this issue in the past have reached widely differing results. One line of authority holds that a stranger's adverse possession does not bar the mortgagee's rights to the property, with some cases limiting the application of this rule to situations where the adverse possession was initiated subsequent to the mortgage. A second line of authority concludes that a mortgagee takes no better title than the owner, and like the owner, is bound to take notice of any adverse possession claim being asserted at the time of the mortgage, with some cases making no distinction as to whether adverse possession preceded or followed the mortgage. Still a third line of authority generally holds that the time period for adverse possession begins to run against a mortgagee only at such time as the mortgagee has a right to actual possession or foreclosure. *See* 3 Am.Jur.2d, *Adverse Possession*, § 188 (1986). *See also* Annot. 136 A.L.R. 782 (1942); *Stryker v. Rasch*, 57 Wyo. 34, 112 P.2d 570 (1941).

The case before us is one in which the adverse possession began before the execution of the mortgage. In *Stryker*, the Wyoming Supreme Court pointed out some of the reasoning used by courts which have held in favor of the adverse possessor in such circumstances. The court examined the proposition that the mortgagee should have no greater right to oust the adverse possessor than the owner of the land:

> [W]e cannot subscribe to the contention that a mortgagee can assert a right against one in possession of land holding adversely that could not be asserted by the mortgagor if the mortgage had not been made. To do so would be to hold that the owner of the legal title could at any time suspend the running of the statute of limitations, by simply executing a mortgage, payable at some time in the future.

112 P.2d at 573 (citing *Schafer v. Hauser*, 111 Mich. 622, 70 N.W. 136, 137 (1897)). The court also noted that it would make sense to hold that the mortgagee in this type of situation should be required to take notice of the rights of the person who was in possession of the premises at the time when he takes his mortgage.

These common law arguments appear to have some merit, but we are prevented from following them because of the language of Arizona's relevant limitations statute which provides:

A person *who has a cause of action for recovery of any lands,* tenements or hereditaments from a person having peaceable and adverse possession thereof, cultivating, using and enjoying such property, shall commence an action therefor within ten years *after the cause of action accrues,* and not afterward.

A.R.S. section 12–526(A) (emphasis supplied). The language of section 12–526(A) implies that only a person with a *present* right to recover land from an adverse possessor is required to begin an action to do so within the ten-year period to prevent his claim from being barred pursuant to A.R.S. section 12–527. As the *Ziggy's* court observed in a somewhat different context, "[u]nder A.R.S. § 12–526, the statute of limitations can only run against '[a] person who has a cause of action for recovery of any land.' " 152 Ariz. at 107, 730 P.2d at 284.

The Jacksons, who hold a deed of trust on the property, would have had no right to recover the lands from the Berryhills unless Moore defaulted on the promissory note in which case the Jacksons could foreclose on the property and then bring an action to recover the property. The parties presented no evidence indicating Moore to be in default in this case. Therefore, the Jacksons had no subsequently ensuing cause of action to recover the property.

■■■ Arizona is a lien theory state. A mortgage creates lien rights in the mortgagee, but it passes neither legal nor equitable title to the mortgagee. *Lane Title and Trust Co. v. Brannan,* 103 Ariz. 272, 277, 440 P.2d 105, 110 (1968); *Cooley v. Veling,* 19 Ariz. App. 208, 209, 505 P.2d 1381, 1382 (1973). Although the subject matter of an action to quiet title is the title itself and not the land, a mortgagee's interest does not attach to the title. Rather, it attaches to the land. *Saxman v. Christmann,* 52 Ariz. 149, 154, 79 P.2d 520, 522 (1938). Thus, under Arizona law, a mortgagee cannot bring an action to quiet title because the mortgagee has no title. *Id.* In addition, A.R.S. section 33–703 [3] makes it clear that a mortgage does not entitle the mortgagee to possession of the property absent express terms of the mortgage.

For the above stated reasons, we determine that since the Jacksons' cause of action as mortgagees to recover from Moore the land adversely possessed by the Berryhills had not yet accrued, the time limitations of A.R.S. section 12–526 did not begin to run against them. Therefore, their lien claim with respect to the disputed strip of land is not barred. The judgment as to the Jacksons must be reversed along with the award of attorney's fees made against them. [4]

### ATTORNEY'S FEES ON APPEAL

■■■ The Berryhills request attorney's fees on appeal. Having prevailed on the adverse possession claim against Moore and having complied with the requirements of A.R.S. section 12–1103(B), the Berryhills are entitled to an award of attorney's fees against Moore. *See, e.g., Lewis v. Pleasant Country, Ltd.,* 173 Ariz. 186, 840 P.2d 1051 (App.1992); *Mariposa Development Co. v. Stoddard,* 147 Ariz. 561, 711 P.2d 1234 (App. 1985).

■■■ The Jacksons request attorney's fees against the Berryhills pursuant to A.R.S. section 12–341.01. An award pursuant to this statute is not available in a quiet title action. *See Lange v. Lotzer,* 151 Ariz. 260, 261, 727 P.2d 38, 39 (App.1986). The claim against the Jacksons and their counterclaim centered around the question of whether the Berry-

---

3. A.R.S. section 33–703 provides in pertinent part:

   A. A mortgage is a lien upon everything that would pass by a grant of the property, but does not entitle the mortgagee to possession of the property unless authorized by the express term of the mortgage....

   B. Title acquired by the mortgagor subsequent to the execution of the mortgage inures to the mortgagee as security *as if acquired* before the execution.

4. The Jacksons' argument that A.R.S. section 12–1104 entitles them to relief is without merit. That statute merely provides that where it can be shown that enforcement of a lien is barred by a statute of limitations, a person seeking quiet title is entitled to judgment barring assertion of the lien. It does not provide, as the Jacksons claim, that a court lacks jurisdiction to enter a judgment estopping assertion of the lien when the remedy is not barred by the statute of limitations.

hills were entitled to quiet title extinguishing their lien. Accordingly, we conclude that the Jacksons are not entitled to attorney's fees pursuant to A.R.S. section 12–341.01.

### CONCLUSION

For the reasons explained in this opinion, we affirm the portion of the trial court's judgment that quieted title to the disputed land in the Berryhills against the interest of Moore, except as to that portion washed away in the flood. We remand for further proceedings consistent with this opinion. The Berryhills are entitled to an award of attorney's fees on appeal against Moore and may file a statement of costs and application for attorney's fees pursuant to Rule 21, Ariz. R.Civ.App.Proc. We reverse the portion of the judgment that purported to extinguish the lien rights of the Jacksons upon the disputed property.

FIDEL, P.J., and TOCI, J., concur.

## PROPERTY SKETCH BEFORE THE FLOOD

SW1/4 SE1/4 SW1/4 NW1/4     SE1/4 SE1/4 SW1/4 NW1/4

WEST PARCEL     EAST PARCEL

TA-DO-HOYA TRAIL

SQUAW VALLEY ROAD

**ADAPTED FROM EXHIBITS 31 AND 35**

1. House
2. Barn
3. Well
4. Water trough
   River bank

• Sprinkler heads located on Exhibit 31 by Robert Berryhill
⊙ Sprinkler head located on Exhibit 35 by Malcolm McCarter

## PROPERTY SKETCH AFTER THE FLOOD

SW1/4 SE1/4 SW1/4 NW1/4          SE1/4 SE1/4 SW1/4 NW1/4

WEST PARCEL          EAST PARCEL

SQUAW VALLEY ROAD

ADAPTED FROM EXHIBITS 31 AND 35

1.   House
2.   Barn
3.   Well
4.   Water trough
     River bank

•    Sprinkler heads located on Exhibit 31 by Robert Berryhill

⊙    Sprinkler head located on Exhibit 35 by Malcolm McCarter