945 P.2d 312

McDOWELL MOUNTAIN RANCH LAND
COALITION, Appellant,

v.

Donna VIZCAINO, Murray F. Wilson, Carla and Peter Homenick and Frances Young, Helen Purcell, Maricopa County Recorder; City of Scottsdale, a municipal corporation; and Sonia Robertson in her capacity as City Clerk, Appellees.

No. CV–97–0204–AP.

Supreme Court of Arizona,
En Banc.

Sept. 18, 1997.

Robbins Shumway & Foreman by John Jeffrey Bouma, Phoenix, for McDowell Mountain Ranch Land Coalition.

Snell & Wilmer, L.L.P. by Lonnie J. Williams, Jr. and Lisa M. Coulter, Phoenix, for Donna Vizcaino, Murray F. Wilson, Carla Homenick, Peter Homenick and Frances Young.

Grant Woods, Attorney General by C. Timothy Delaney and Eryn M. McCarthy, Assistant Attorneys General, Phoenix, for the State of Arizona.

## OPINION

MARTONE, Justice.

This direct appeal arises from an action challenging the residency status of referendum petition circulators. The trial court found that a sufficient number of signatures were gathered by circulators who lacked the requisite "intent to remain" in Arizona under A.R.S. § 16–101(B) to enjoin the election. We affirm.

### I. Introduction

On February 18, 1997, the City of Scottsdale adopted an ordinance rezoning certain property from residential to commercial. This allowed the Phoenix Coyotes, a National Hockey League team, to build an ice rink for training and public recreation.

The *McDowell Mountain Ranch Land Coalition*, a political committee, organized a referendum petition drive to oppose the rezoning. The Coalition needed 2,537 signatures to get the referendum on the ballot.

Progressive Campaigns, Inc., does nationwide contract campaign work, including gathering signatures, door-to-door canvassing, and fund raising. The Coalition hired Progressive to help circulate the referendum petitions. The Coalition submitted 4,898 sig-

natures to the Scottsdale City Clerk. The Scottsdale City Council scheduled the election for June 24, 1997.

On April 7, plaintiffs, residents of Scottsdale, filed this action against the Coalition to enjoin the election, contending that 2,621 of the signatures were invalid. The complaint alleged that the Progressive circulators had no intent to remain in Arizona when they registered to vote here, and hence were not qualified electors.

After a trial to the court, the judge found that eight of the circulators did not have the requisite intent to qualify as electors. He disqualified the 2,593 signatures they gathered. That left only 2,305 valid signatures, which fell below the 2,537 needed. The court directed the City of Scottsdale not to place the referendum on the ballot.

The Coalition appealed directly to this court under A.R.S. § 19–122(C). On May 16, 1997, we issued an order affirming the judgment of the trial court, with a written disposition to follow.

## II. Analysis

### A. Intent to remain

■ A.R.S. § 19–114 requires that circulators of initiative or referendum petitions be "qualified electors," or else the collected signatures are void. A qualified elector is one who is properly registered to vote. A.R.S. § 16–121(A). Proper registration requires state residency. A.R.S. § 16–101(A). A resident is one who has "actual physical presence in this state ... combined with an intent to remain." A.R.S. § 16–101(B). A voter's registration is presumed to be proper, but the presumption may be rebutted by clear and convincing evidence. A.R.S. § 16–121.01.

The trial court found that of the nine circulators challenged—Andrea Slawson, Joe O'Neil, Craig Garrett, William Westermeyer, Joan Mitchell, David Coit, Amy Donaldson, Jon Reeves, and Diann Gentry—only Andrea Slawson demonstrated the requisite intent to remain in Arizona when she registered to vote.

■ The circulators testified that they intended to remain here when they moved to Arizona. They thought the Progressive office would be permanent. The Coalition argues that the evidence was insufficient to overcome the stated intent of the circulators and the statutory presumption of the validity of their registration. But "[t]he intentions of a person are to be judged not only by his statements but also upon his conduct and the surrounding circumstances." *O'Hern v. Bowling,* 109 Ariz. 90, 92, 505 P.2d 550, 552 (1973). Outward indicia, like a month-to-month lease, failure to order telephone service, failure to have the utility service transferred to one's own name, or failure to file a change of address with the post office, may rebut a personal declaration of intent to remain. *Id.* The objective evidence presented in this case rebuts the circulators' testimony that they intended to remain in Arizona when they registered to vote here.

Joe O'Neil moved from California to Phoenix in January 1997. Although he testified that he considered his move permanent, he did not move all of his possessions into his Phoenix apartment. He keeps many personal effects, clothes, stereo and a bed at his parents' home in Tucson, and receives some of his mail there. He shares his Phoenix apartment with two Progressive co-workers, his lease is month-to-month, and he has no Arizona phone listing or bank account. Although he obtained an Arizona driver's license, his car is registered in California. He filed no change of address reflecting his move to Arizona.

Craig Garrett testified that he had moved five times in one year while working for Progressive and that he had worked with Westermeyer, Mitchell, Donaldson and Reeves in other states. He lives with Joe O'Neil. He pays no rent in Arizona, and he has no Arizona phone listing, bank account or driver's license. He also filed no change of address when he moved here. He used a Washington address on the 1996 tax extension form he filed while living in Phoenix.

Five of the circulators—Westermeyer, Mitchell, Coit, Donaldson and Reeves—live in a furnished three-bedroom Scottsdale apartment rented and paid for by Progressive. Progressive found the apartment

through Gables Corporate Accommodations which provides short-term leases to corporations. The Scottsdale lease, signed on March 5, 1997, is month-to-month, and includes utilities, water and phone. The five tenants have no services listed in their names. All five worked together in Los Angeles until February, 1997, when they moved to Phoenix. They do not have Arizona bank accounts, and did not file forwarding addresses for Arizona. Of the five, only Westermeyer and Reeves have Arizona driver's licenses.

On March 17, twelve days after the lease was signed, Progressive gave notice that it would vacate the Scottsdale apartment on April 15. Although Westermeyer testified that he expected to move out and find his own permanent housing in Arizona, he also testified that at the time notice was given, none of the tenants had found any such housing. Progressive withdrew the notice on April 3, but Westermeyer conceded that the withdrawal was made after he "became aware of the issues involved in this lawsuit." Tr., April 22, 1997, at 158.

Finally, other witnesses testified that they heard O'Neil, Donaldson and Coit say that they would soon be moving from Phoenix to Florida. Progressive's president testified that Progressive was likely to go to Florida as part of a national term-limits campaign contract, and that this opportunity had been discussed with his circulators.

The court found that these seven circulators (O'Neil, Garrett, Westermeyer, Mitchell, Coit, Donaldson and Reeves) demonstrated "a history of nomadic movement . . . whenever Progressive Campaigns opens a new office or receives a new contract." Minute Entry of May 1, 1997, at 8. Although the eighth circulator, Diann Gentry, did not demonstrate the same nomadic profile, the court found that evidence of her continued strong ties to Nebraska rebutted her stated intent to remain in Arizona. Gentry testified that she maintains a residence in Nebraska, pays utilities there, receives mail there, and used that address on her 1996 tax extension form. She deposits her paychecks to a Nebraska bank account, keeps her car registered and insured in Nebraska, and uses a Nebraska calling card. In contrast, she owns no real property in Arizona, pays no rent here, and has no Arizona phone listing. She also filed no change of address when she moved here.

The objective evidence in this case is sufficient to rebut the circulators' testimony that they intended to remain in Arizona. The evidence supports the finding that Progressive circulators operate as political vagabonds, going anywhere there is work, and intending to remain nowhere. There is no objective evidence that they intended to remain here indefinitely. They did not, for example, find permanent housing, file changes of address, order services, or open bank accounts. Simply asserting one's intent does not suffice. O'Hern, 109 Ariz. at 92, 505 P.2d at 552. The court's finding that the presumption of valid registration had been rebutted by clear and convincing evidence is supported by the evidence. Rule 52(a), Ariz. R. Civ. P.

The power of referendum is extraordinary. It allows a minority of voters to delay laws that may well represent the wishes of the majority. Western Devcor, Inc. v. City of Scottsdale, 168 Ariz. 426, 429, 814 P.2d 767, 770 (1991). Elections are costly. Arizona's circulator requirement is intended to ensure that those involved in direct law making have ties to the state and a stake in the outcome. "We can think of no better way to preserve the integrity of the referendum process as it relates to local ordinances than to require that only those eligible to vote for the members of the body which passed the ordinance be able to engage in the 'core political speech' of attempting to gather signatures to challenge the ordinance." Browne v. Russell, 27 Cal.App.4th 1116, 33 Cal.Rptr.2d 29, 34 (1994) (quoting Meyer v. Grant, 486 U.S. 414, 422, 108 S.Ct. 1886, 1892, 100 L.Ed.2d 425 (1988)). The Progressive circulators are migratory workers with no interest in the ice rink or other local issues. They will not be affected by the changes they advance.

■ "Where a power so great as the suspension of an ordinance or of a law is vested in a minority, the safeguards provided by law against its irregular or fraudulent exercise should be carefully maintained." Direct Sellers Ass'n v. McBrayer, 109 Ariz. 3, 5–6, 503 P.2d 951, 953–54 (1972) (quoting Aad Temple

*Bldg. Ass'n v. Duluth,* 135 Minn. 221, 226–27, 160 N.W. 682, 684–85 (1916)). *See also Western Devcor,* 168 Ariz. at 429, 814 P.2d at 770 (requiring strict compliance in referendum context). To vest roving political circulators with the extraordinary power to delay the effective date of properly enacted legislation would violate both the letter and the spirit of our law.

### B. Constitutionality of Arizona's election statutes

■ The Coalition asserts various constitutional challenges to the residency requirement. But these challenges were not properly raised below and thus we do not consider them here. *Hawkins v. Allstate Ins. Co.,* 152 Ariz. 490, 503, 733 P.2d 1073, 1086 (1987). Although the Coalition asks us to review those challenges because of their state-wide importance and significance, *see Dombey v. Phoenix Newspapers, Inc.,* 150 Ariz. 476, 482, 724 P.2d 562, 568 (1986), this case is not a suitable candidate for such extraordinary relief.

■ The Coalition also argues that improper time constraints and difficulty in obtaining counsel caused its waiver. But, as we discuss below, the time constraints, though tight, were not improper. Moreover, "[c]ourts should not be forced to make hasty legal decisions in such important areas simply because the parties bringing such cases had difficulty, as here, in finding lawyers." *Mathieu v. Mahoney,* 174 Ariz. 456, 460, 851 P.2d 81, 85 (1993).

### C. Request for continuance

■ The Coalition was served with the complaint on April 9, 1997. On April 16, it sought a continuance based in part on difficulty in obtaining counsel. The court granted the request and scheduled the hearing for April 22. On April 18, the Coalition moved for another continuance. The court heard the motion on April 21. Maricopa County and the City of Scottsdale objected because of deadlines for printing ballots and publicity pamphlets. Plaintiffs also objected, and noted that the issues (mainly the intent to remain) were narrow, and that most of the evidence was in the control of the Coalition.

The court denied the motion. The Coalition argues that it was deprived of its right to prepare and present its case. We disagree.

■ Election cases generally are characterized by accelerated schedules because of statutory requirements and the imminence of the elections themselves. We acknowledge that they present a challenge to court and counsel. But the decision to grant or deny a continuance is in the sound discretion of the trial court. Considering the deadlines, the narrowness of the issues, the granting of the first continuance, as well as A.R.S. § 19–122(C)'s mandate that the action be heard and decided as soon as possible, the trial court did not abuse its discretion in denying the second motion to continue. There was no error.

### D. Sufficiency of the findings

■ The Coalition argues that the trial court failed to make sufficient findings on the issue of the circulators' intent to remain in Arizona. We disagree. Rule 65(h), Ariz. R. Civ. P., requires that "[e]very order granting an injunction . . . set forth the reasons for its issuance." Findings are sufficient if they are "pertinent to the issues and comprehensive enough to provide a basis for the decision." *Miller v. Board of Supervisors,* 175 Ariz. 296, 299, 855 P.2d 1357, 1360 (1993) (quoting *Gilliland v. Rodriquez,* 77 Ariz. 163, 167, 268 P.2d 334, 337 (1954)). The nine-page, detailed minute entry more than adequately sets forth the court's findings and legal conclusions. The court explained that Gentry's ties to Nebraska and the nomadic pattern of the other seven were its reasons for finding that the circulators lacked the requisite intent to remain in Arizona. These findings are clearly supported by the evidence. There was no error.

The judgment of the superior court is affirmed.

ZLAKET, C.J., JONES, V.C.J., and FELDMAN and MOELLER, JJ., concur.