80 P.3d 287

**Joel J. KOCHER and Annmarie Kocher, husband and wife, Plaintiffs–Appellants,**

v.

**DEPARTMENT OF REVENUE OF the STATE OF ARIZONA, Defendant–Appellee.**

**No. 1 CA–TX 03–0002.**

Court of Appeals of Arizona, Division 1, Department T.

Dec. 11, 2003.

Hawley Nystedt & Fletcher, P.C. By Gerald G. Hawley and Gary L. Fletcher, Tucson, Attorneys for Plaintiffs–Appellants.

Terry Goddard, Attorney General By Lisa A. Neuville, Assistant Attorney General, Phoenix, Attorneys for Defendant–Appellee.

## OPINION

WINTHROP, Judge.

¶ 1 This appeal arises out of the tax court's judgment that Joel J. and AnnMarie Kocher ("Taxpayers") were Arizona residents throughout the 1995 tax year. We affirm.

### FACTS AND PROCEDURAL BACKGROUND

¶ 2 Joel Kocher served as Vice President of Sales for Dell Computer Corporation in Austin, Texas from 1987 until September 1994. He terminated his employment in October 1994 in accordance with a detailed written severance agreement. Joel agreed not to compete against Dell in any similar desk-top computer business until October 31, 1996. In exchange, Dell granted Joel an accelerated right to exercise his Dell stock options.

¶ 3 In October 1994, Joel accepted employment as chief operating officer of Artisoft, a

computer software company in Tucson, Arizona, for an indeterminate period of time. Joel testified that he needed this job because he had recently been divorced and had a $3000 monthly support obligation for his children in Texas. He further testified that he had little financial liquidity due to federal "insider trading" restrictions on the timing of selling his Dell stock or exercising his Dell stock options.

¶ 4 Shortly after moving to Arizona, Joel learned that his fiancee, AnnMarie, was pregnant. He accelerated plans to marry AnnMarie and move her and her two sons to Arizona. AnnMarie experienced medical problems in November 1994 and stopped working. Taxpayers were married in Tucson on December 1, 1994. In the affidavit for a marriage license, Joel swore that he was a resident of Tucson, Arizona.

¶ 5 Before marrying AnnMarie, Joel bought a $750,000 home in Tucson. He later testified that he had purchased a house that he could "flip" quickly when the opportunity to return to Texas materialized. However, Joel also testified that he had received a "good deal" on the home because the prior owner was having trouble selling it. Joel moved into the Arizona home in December 1994 and spent time with AnnMarie in Arizona around Christmas 1994.

¶ 6 For the 1994 tax year, Joel filed an income tax return for part-year Arizona residents that he signed under penalty of perjury. Taxpayers also filed a part-year Arizona return for the 1996 tax year.[1] For the 1995 tax year, Taxpayers' federal income tax return and original Arizona full-time resident tax return reported $5,602,965 in income from the exercise of the Dell stock options. Taxpayers subtracted that income from their Arizona gross income on their 1995 Arizona income tax return.

¶ 7 In 1999, the Arizona Department of Revenue ("ADOR") issued an assessment for the Arizona income tax due on this amount, with penalties and interest. Taxpayers pro-

tested the assessment of tax and penalties.[2] After exhausting their administrative remedies, Taxpayers appealed to the tax court.

¶ 8 After a one-day bench trial, the tax court found that Taxpayers were Arizona residents from late 1994 through October 1996. Accordingly, they were Arizona residents in 1995 and therefore not entitled to subtract the stock option income from the gross income listed on their Arizona tax return for that year. The tax court detailed its reasons in five pages of findings of fact and conclusions of law and entered a judgment. This appeal followed.

## DISCUSSION

### I. Standard of Review.

¶ 9 This court will sustain factual findings unless they are clearly erroneous. *Combs v. DuBois*, 135 Ariz. 465, 468, 662 P.2d 140, 143 (App.1982). A finding of fact is not clearly erroneous if substantial evidence supports it, even if substantial conflicting evidence exists. *Moore v. Title Ins. Co. of Minn.*, 148 Ariz. 408, 413, 714 P.2d 1303, 1308 (App.1985). In applying the clearly erroneous standard to factual findings, we will "defer to any factual findings explicitly or implicitly made, affirming them so long as they are supported by reasonable evidence." *Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, 253–54, ¶ 10, 63 P.3d 282, 284–85 (2003).

¶ 10 We also recognize that a finder of fact is not bound by the uncontradicted testimony of an interested party. *City of Tucson v. Apache Motors*, 74 Ariz. 98, 107–08, 245 P.2d 255, 261 (1952). Moreover, we will affirm a trial court's judgment if it is correct for any reason. *St. Joseph's Hosp. v. Ariz. Health Care Cost Containment Sys.*, 185 Ariz. 309, 312, 916 P.2d 499, 502 (App. 1996).

### II. Taxpayers Became Arizona Residents in 1994.

¶ 11 Arizona tax law defines the term "resident" to include "[e]very individual who is in

---

1. Joel and his family moved back to Texas in October 1996.

2. In 2000 and 2001, while administrative tax litigation on these issues was pending, Taxpayers

filed amended returns for the 1994, 1995, and 1996 tax years stating that they were not residents of Arizona.

this state for other than a temporary or transitory purpose." Ariz.Rev.Stat. ("A.R.S.") § 43–104(19)(a) (1980 & Supp. 1994). The statute creates a rebuttable presumption that an "individual who spends in the aggregate more than nine months of the taxable year within this state" is an Arizona resident. A.R.S. § 43–104(19)(c).

¶ 12 Of necessity, the question of residency under this statute involves evaluation of the taxpayer's intent and purpose for being in Arizona. While intent is arguably a subjective matter, our courts will also look to an individual's words, actions and other outward manifestations to determine intent. The " 'intentions of a person are to be judged not only by his statements but also upon his conduct and the surrounding circumstances.' " *McDowell Mountain Ranch Land Coalition v. Vizcaino,* 190 Ariz. 1, 3, 945 P.2d 312, 314 (1997) (quoting *O'Hern v. Bowling,* 109 Ariz. 90, 92, 505 P.2d 550, 552 (1973)). For example, "[o]utward indicia, like a month-to-month lease, failure to order telephone service, failure to have the utility service transferred to one's own name, or failure to file a change of address with the post office, may rebut a personal declaration of intent to remain." *Id. See also Webster v. State Bd. of Regents,* 123 Ariz. 363, 367, 599 P.2d 816, 820 (App.1979) ("As recognized by our courts, once physical presence has been established, the key factor in resolving the domicile issue is intent, and the existence of the requisite intent becomes a question of fact that is evidenced by the conduct of the person in question.").

¶ 13 In *DeWitt v. McFarland,* the supreme court explained that the intent of the taxpayer necessary to establish legal residency "need not be one to remain in a given place for all time, it is generally sufficient if the intent be to make presently the given location one's home even though one may have in mind the possibility of making a change should future events demand." 112 Ariz. 33, 34–35, 537 P.2d 20, 21–22 (1975) (quoting *State v. Dillett,* 240 Wis. 465, 3 N.W.2d 699, 700 (1942)). "It is not important if there is within contemplation a vague possibility of eventually going elsewhere, or even of returning whence one came. If the new state

is to be one's home for *an indefinite period of time,* he has acquired a new domicile." *Id.* at 34, 537 P.2d at 21 (citations omitted) (emphasis in original).

¶ 14 The *DeWitt* taxpayer lived in Arizona until he accepted a job with an American company doing construction work in the Republic of Vietnam. *Id.* at 33, 537 P.2d at 20. While there, the taxpayer rented a house and sent for his wife. *Id.* at 35, 537 P.2d at 22. Although his Vietnam home was not permanent, the supreme court affirmed the trial court's finding that Vietnam was the taxpayer's domicile because he intended to remain there for an indefinite period. *Id.*

¶ 15 Taxpayers here claim that they moved to Arizona only for a definite and temporary period. This claim is based upon Joel's testimony that he intended to return to Texas when his non-competition restriction expired. The tax court, however, found that Joel accepted employment at Artisoft for an indeterminate period and did not bind himself to a specific employment term. The tax court also found that AnnMarie moved to Arizona for an indeterminate period and intended to remain here as long as her husband chose to do so. The record contains substantial support for these findings.

¶ 16 Joel admitted on cross-examination that he started discussions with Artisoft before he resigned from Dell. Because the Artisoft job offer preceded the non-competition agreement, we do not accept the argument that the agreement compelled Joel to accept the Artisoft job. Moreover, the non-competition clause in Joel's termination agreement did not impose any geographical limitations. Joel could have stayed in Texas, yet he neither investigated other opportunities nor considered any position other than the one he took with Artisoft.

¶ 17 The record further reflects that Joel and Artisoft did not treat the position as temporary. Joel did not tell Artisoft that he would only work at Artisoft for two years, or that he intended to move back to Texas at the end of the two-year non-competition period. Further, in 1995, Artisoft promoted Joel to president and put him on its board of directors. Finally, the agreement with Arti-

soft did not bind Joel to any specific or limited term of employment.

¶ 18 The trial testimony explains why Taxpayers moved back to Texas in 1996. In 1995, Power Computing, a Texas-based computer company, launched a campaign to lure Joel away from Artisoft. By Spring 1996, Joel was ready to change jobs, but Dell would not waive the non-competition provision. Accordingly, Joel accepted the Power Computing position one day after the provision expired.

¶ 19 The mere fact that Taxpayers moved back to Texas after the non-competition provision expired does not demonstrate that it was always their intent to do so. The tax court believed that Joel saw an opportunity at Artisoft to help a fledgling corporation grow into another successful enterprise, just as he had with Dell. The tax court found no competent evidence as to what, if any, efforts Joel made to procure employment in Texas before accepting the offer from Artisoft. The court further found that when Joel moved to Arizona "it was unknown to him as to whether he would remain in Arizona for weeks, months or years." The trial testimony supports a reasonable inference that Joel took the Artisoft job with the good faith hope that it would be mutually beneficial, but later found a better opportunity at Power Computing.

¶ 20 Taxpayers further contend that the "record reflects no evidence of any physical presence whatsoever of Plaintiff, AnnMarie Kocher, during 1994" in Arizona. Taxpayers, however, were married in Tucson on December 1, 1994. AnnMarie executed the marriage license application and marriage certificate in Tucson on that date. Also, Joel specifically testified that AnnMarie spent time in Arizona around Christmas 1994. In addition, AnnMarie experienced a health problem in November 1994 and stopped working. This testimony and the exhibits establish a reasonable inference that AnnMarie moved to Arizona in December 1994.

¶ 21 Other evidence indicates that Taxpayers moved to Arizona with an intent to remain here indefinitely. For example, Joel bought an expensive home in Tucson, and Taxpayers retained no Texas real property while residing here. During their two years in Tucson, Taxpayers registered their cars in Arizona, obtained Arizona drivers licenses, and enrolled the children in Arizona public schools. They also maintained an Arizona checking account and an Arizona mailing address. Joel filed a part-year resident return for 1994, and both Taxpayers filed a full-year resident return in 1995 and a part-year resident return in 1996, and did not seek to amend such returns until faced with the assessment issued by the ADOR in 1999. These considerations support the trial court's findings. Accordingly, we affirm the tax court's determination that Taxpayers were Arizona residents throughout the 1995 tax year.

### III. Taxpayers' Adjusted Gross Income Includes Receipts from the Exercise of their Dell Stock Options.

■ ¶ 22 The Arizona Legislature has expressed its intent to impose on each Arizona resident "a tax measured by taxable income wherever derived." A.R.S. § 43–102(A)(4) (1980 & Supp.1994). To accomplish this goal, Arizona law defines state "gross income" as the resident's "federal adjusted gross income for the taxable year, computed pursuant to the Internal Revenue Code." A.R.S. § 43–1001(2) (1980 & Supp.1994). The resident then applies applicable additions and subtractions set forth in the Arizona tax statutes to determine their Arizona adjusted gross income. A.R.S. § 43–1001(1).

¶ 23 Joel exercised his Dell stock options in 1995. His federal tax return included $5,602,965 in income from those stock options. Taxpayers then subtracted this amount from line eighteen of their Arizona resident personal income tax return. As authority for this deduction, Taxpayers rely upon A.R.S. § 43–1097(B) (1980 & Supp. 1994):

> During the tax year in which a taxpayer changes from a nonresident to a resident, Arizona taxable income shall include all of the following:
>
> 1. All income and deductions realized or recognized, or both, depending on the taxpayer's method of accounting, dur-

ing the period the individual was a resident, except any income accrued by a cash basis taxpayer prior to the time the taxpayer became a resident of this state.

This statute permits deductions only "[d]uring the tax year in which a taxpayer changes from a nonresident to a resident." The tax court found that the statute did not apply because Taxpayers became Arizona residents in 1994.

¶ 24 Taxpayers contend that Joel was not an Arizona resident in 1994, noting that he resided here for fewer than nine months that year. They point out that A.R.S. § 43–104(19)(c) creates a rebuttable presumption that a taxpayer who lives in Arizona for at least nine months of the taxable year is a resident. However, that statute does not provide that a person who lives in Arizona for fewer than nine months is not a part-year resident.

¶ 25 Under A.R.S. § 43–1097(B)(1), Joel did not have to pay Arizona income tax on his Texas income in 1994. Instead, he filed a part-year return to report the Arizona income paid by Artisoft. AnnMarie terminated her employment and did not receive Arizona income that year. Accordingly, she did not have to file an Arizona income tax return in 1994. By 1995, Taxpayers were both full-year Arizona residents and were subject to Arizona income tax on their full federal adjusted gross income.[3]

¶ 26 Taxpayers argue that the stock options were "earned" while in Texas, but that federal securities laws prevented the exercise of the options until 1995. Taxpayers are thus attempting to create a new Arizona income tax subtraction for all income earned outside the state. This theory flies in the face of the Arizona Legislature's intent to tax an Arizona resident's income "wherever derived." A.R.S. § 43–102(A)(4). *See also Clark v. Peterson,* 78 Ariz. 297, 279 P.2d 451 (1955). Arizona law provides a small window for a person to wind up his affairs before moving to Arizona; it does not provide full-year taxpayers with a subtraction for all income derived from out-of-state employment.

## *CONCLUSION*

¶ 27 Taxpayers have failed to show that the finding of Arizona residency in 1995 was clearly erroneous. Consequently, they are not entitled to deduct stock option income because they received it the year after they changed residency. The tax court's judgment is affirmed.

CONCURRING: JON W. THOMPSON, Presiding Judge, and JOHN C. GEMMILL, Judge.

---

**3.** Taxpayers mistakenly contend that a Pennsylvania Supreme Court case supports their analysis. In *Marchlen v. Township of Mt. Lebanon,* the court held that the taxpayer's receipts for the exercise of non-qualified stock options constituted earned income, not investment income, and thus were subject to municipal tax. 560 Pa. 453, 746 A.2d 566 (2000). *Marchlen* does not discuss which local jurisdiction could tax income arising from non-qualified stock options.