IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

TOWN OF FLORENCE,
*Plaintiff/Appellant,*

v.

FLORENCE COPPER INC.,
*Defendant/Appellee.*

No. 1 CA-CV 19-0504
FILED 3-23-2021

Appeal from the Superior Court in Maricopa County
No. CV2015-000325
The Honorable Roger E. Brodman, Judge

**AFFIRMED**

COUNSEL

Sims Mackin, Phoenix
By Catherine M. Bowman
*Counsel for Plaintiff/Appellant*

Osborn Maledon, PA, Phoenix
By Colin F. Campbell, Timothy J. Eckstein, Payslie M. Bowman
*Counsel for Defendant/Appellee*

Jones, Skelton & Hochuli, P.L.C., Phoenix
By Eileen Dennis GilBride
*Co-Counsel for Amicus Curiae League of Arizona Cities and Towns*

League of Arizona Cities and Towns, Phoenix
By Christina Estes-Werther
*Co-Counsel for Amicus Curiae League of Arizona Cities and Towns*

**OPINION**

Presiding Judge David D. Weinzweig delivered the opinion of the Court, in which Judge Jennifer M. Perkins and Judge James B. Morse Jr. joined.

**W E I N Z W E I G**, Judge:

¶1        The Town of Florence ("Town") annexed a large parcel of property in 2002 and entered a development agreement with its owner, granting him and his successors in interest a vested right to operate a copper mine on the parcel. By its terms and under Arizona law, the development agreement could be amended only with both parties' consent. The Town later rezoned the property to allow the owner to build more homes on the property. Then, no longer happy with the prospect of a copper mine within city limits, the Town sued Florence Copper, Inc. ("FC"), the successor in interest, asking the superior court to declare mining a prohibited use. The court ruled against the Town, which then appealed from the final judgment and attorney fee award in favor of FC. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2        In 2000, a real estate developer named W. Harrison Merrill bought over a thousand acres of unincorporated land near the Town from a mining company (the "Mining Parcel"), along with mining infrastructure and mineral rights to an adjacent leased parcel (the "Leased Parcel"). Geologists first discovered copper beneath the Mining Parcel in the 1960s, and it had since been studied, drilled and developed. Between the Mining and Leased Parcels, Merrill acquired the right to mine an estimated 1.7 billion pounds of recoverable copper. Merrill also acquired another several thousand acres outside the Town, where he intended to build a master-planned community named Merrill Ranch. In all, Merrill acquired around 7,500 acres of unincorporated land (the "Property"). He intended to first extract the copper with a mining partner and then develop Merrill Ranch on the Property.

*Annexation, the Development Agreement and the 2003 Plan*

¶3        In 2002, the Town expressed interest in annexing the Property. Arizona law required Merrill's consent. *See* A.R.S. § 9-471(A)(4) (annexation requires consent of "more than one-half of the persons owning real and personal property" in the unincorporated area "that would be

subject to taxation [following] annexation"). During negotiations, Merrill said he would not consent to annexation unless the Town assured him "maximum flexibility in the development" of his Property. The Town agreed and Merrill consented.

¶4　　　　The Town and Merrill entered a 35-year agreement in November 2003, formalized in a Pre-Annexation Development Agreement ("Development Agreement") and a Planned Unit Development Plan ("2003 Plan"), which was attached to and incorporated into the Development Agreement. In December 2003, the Town Council approved the Development Agreement and the 2003 Plan, annexed the Property, and adopted a corresponding amendment to the zoning map. Under A.R.S. § 9-500.05(D), the Town filed the Development Agreement and the 2003 Plan with the Pinal County Recorder.

¶5　　　　The Development Agreement recited that (1) the "development of the Property is a major undertaking for [Merrill] and the marketing, economic and investment conditions and magnitude of the development require the development to be constructed in phases over a period of years," and (2) Merrill had "require[d] certain assurances and protection of rights in order that [he] will be allowed to complete the development of the Property in accordance with the [2003] Plan over the period of years permitted by this Agreement."

¶6　　　　The Development Agreement preserved Merrill's "vested right to develop and use the Property in accordance with th[e] Agreement and the [2003] Plan," and directed that associated burdens and benefits would run with the land for 35 years. A.R.S. § 9-500.05(c). To advance those vested rights, the Agreement barred the Town from imposing zoning ordinances or land use regulations "that would change, alter, impair, prevent, diminish, delay or otherwise impact the development or use of the Property as set forth in the [2003] Plan," unless Merrill "specifically agree[d]" in writing.

¶7　　　　The 2003 Plan memorialized the land use requirements Merrill needed for his proposed development, including zoning and design specifications. The Property was zoned "light industrial," which prohibited mining. Still, much of the Property was subject to a non-conforming historical use of copper mining called the BHP Copper Mine Overlay (the "Mine Overlay"), and the 2003 Plan ensured the Mine Overlay would be preserved until the mine was "closed." The 2003 Plan also specified that the developer's right to any non-conforming use would cease if not used for more than 180 days. Because Merrill did not immediately intend to

mine, however, the 2003 Plan expressly excepted copper mining from that requirement.

¶8 Finally, the Development Agreement specified that any amendment to the Agreement must be in writing, executed by both parties and filed within ten days with the Pinal County Recorder. *See* A.R.S. § 9-500.05(C) ("A development agreement may be amended, or cancelled in whole or in part, by mutual consent of the parties to the development agreement or by their successors in interest or assigns."). Since 2003, Merrill and the Town twice amended the Development Agreement per its terms and § 9-500.05(C). Neither amendment related to copper mining on the Property.

*The 2007 Plan and the Rezoning Ordinance*

¶9 Real estate values soared and copper prices plummeted in the first few years after Merrill and the Town entered the Development Agreement. Recognizing these market dynamics, Merrill focused his business efforts on developing homes in 2005 and 2006, and asked the Town to increase the residential density allowed on the Property, as the Town had done for other developers.

¶10 After extensive negotiations, Merrill and the Town agreed to the 2007 Merrill Ranch Master Development Plan ("2007 Plan"), which, among other things, rezoned the Mining Parcel from light-industrial to residential. The Town Council then passed Ordinance No. 460-07 ("Rezoning Ordinance"), amending the Town's zoning map to conform to the 2007 Plan.

¶11 The 2007 Plan was not incorporated into the Development Agreement or recorded with the county recorded—unlike the 2003 Plan—and only appears in the Town's zoning book. In their protracted 2007 negotiations, Merrill and the Town never talked about mining rights. The Rezoning Ordinance did not identify mining as a non-conforming use or purport to amend or supersede the Development Agreement. The Ordinance generally stated, however, that the 2007 Plan "supersede[d] any previously accepted development Plan" on the Property.

¶12 For his part, Merrill continued to believe the Development Agreement's mining rights were valuable. To that end, between 2006 and 2009, he tried to sell the Mining Parcel, searching for and negotiating with prospective buyers, including FC's parent company. In the meantime, the record evidence shows Merrill did not close the mine, never began formal closure procedures, and continued performing the required environmental

monitoring activity. And later, after the Property fell into foreclosure, Merrill touted the Parcel's mining value to prospective purchasers.

*Foreclosure and Florence Copper*

¶13        After the 2008 housing market collapse, Merrill lost the Property in foreclosure. FC's parent company purchased the Mining Parcel at an auction in 2009 for $8.5 million and later acquired mineral rights to the Leased Parcel for $3 million.

¶14        By August 2010, however, the Town no longer supported a mine within its Town limits and insisted the Property's zoning did not allow FC to mine on the site. FC disagreed, but thought it best to work cooperatively and, therefore, formally applied to the Town for rezoning and a special use permit. The superior court later found "[t]his was a reasonable business decision borne out of necessity and was not a waiver or intentional relinquishment of the right to mine."

¶15        The Town—joined by local developers—continued to object to the mine. FC ultimately withdrew its rezoning applications and prepared to commence mining operations under the Development Agreement.

*Litigation Ensues*

¶16        In October 2013, the Town sued FC for a declaratory judgment that the 2007 Plan and the Rezoning Ordinance barred mining on the Property. FC answered and counterclaimed. After discovery, both sides moved for summary judgment. The Town argued the Rezoning Ordinance and the 2007 Plan replaced, superseded and rescinded the 2003 Plan, eliminating any right to mine on the Mining Parcel. FC argued the Development Agreement granted Merrill and FC (as Merrill's successor in interest) a vested right to mine, apart from the 2003 Plan. The Development Agreement was unchanged by the Rezoning Ordinance.

¶17        The superior court granted partial summary judgment to FC and denied the Town's motion. The court held that the Development Agreement "unambiguously provided the Owner a vested right" to mine copper in the Mine Overlay area as a permissible non-conforming use, and the Town could not "unilaterally change the Development Agreement or unilaterally derogate vested rights established by the Development Agreement."

¶18 The superior court set a six-day bench trial to determine whether the mining rights still existed or Merrill and the Town had "mutually agreed" to amend the Development Agreement and eliminate the non-conforming mining rights. After hearing from fourteen witnesses, including Town officials and Merrill, the court held that copper mining rights under the Development Agreement had not been eliminated, modified, limited, amended, waived or abandoned.

¶19 The court ultimately granted declaratory relief to FC, finding that FC had "the available election of judicial remedies for breach of contract, including specific performance or contract damages." The court also awarded $1.7 million in attorney fees to FC under A.R.S. § 12-341.01(A), along with $32,365.55 in costs. The Town timely appealed. We have jurisdiction. *See* A.R.S. §§ 12-120.21(A)(1) and -2101(A)(1).

## DISCUSSION

¶20 We review de novo the interpretation of statutes, ordinances and contracts, *see Contreras Farms Ltd. LLC v. City of Phoenix*, 247 Ariz. 485, 488, ¶ 7 (App. 2019) (statutes and ordinances); *Grosvenor Holdings, L.C. v. Figueroa*, 222 Ariz. 588, 593, ¶ 9 (App. 2009) (contracts), but sustain the superior court's factual findings unless they are clearly erroneous, *Kocher v. Dep't of Revenue*, 206 Ariz. 480, 482, ¶ 9 (App. 2003). We also view the facts on appeal from a bench trial in the light most favorable to upholding the judgment. *Home Builders Ass'n of Cent. Ariz. v. City of Maricopa*, 215 Ariz. 146, 148, ¶ 2 (App. 2007).

## I. Binding Contract and Separation of Powers

¶21 The Town contends the superior court erred for several reasons. First, the Town argues the superior court "was compelled under the separation of powers doctrine to defer to the Town's laws and procedure in determining the zoning for the Property" because the Arizona legislature delegated the Town its zoning authority under A.R.S. §§ 9-462 to -462.08. *See Transamerica Title Ins. Co. v. City of Tucson*, 157 Ariz. 346, 350 (1988). We are not persuaded. Local governments do not possess absolute power over zoning decisions; those decisions are subject to judicial review. *See, e.g.*, *Cardon Oil Co. v. City of Phoenix*, 122 Ariz. 102, 104 (1979) ("When zoning power is used in such a way that the attempted regulation amounts to a 'taking' of property, the zoning ordinance runs into direct conflict with [Ariz. Const. art. 2, § 17.]"); *see also City of Tucson v. Whiteco Metrocom, Inc.*, 194 Ariz. 390, 394, ¶ 10 (App. 1999) (cities do "not have vested rights in [their] zoning powers, and the state can reduce or condition those powers").

¶22 What is more, development agreements—like the Town's zoning authority—are the product of legislative action. The legislature empowered cities and towns to enter development agreements, instructed that their burdens and benefits inure to "successors in interest and assigns," and directed that they cannot be amended or cancelled without mutual consent. A.R.S. § 9-500.05(A), (C), (D). All powers delegated by the legislature to the Town must be exercised consistent with Arizona statutes and the Arizona Constitution. *White Mountain Health Ctr., Inc. v. Maricopa Cty.*, 241 Ariz. 230, 248-49, ¶ 65 (App. 2016).

¶23 By authorizing cities and towns to enter development agreements, the legislature expanded the land-use toolbox of local governments to attract large investments from developers who demand more certainty and less risk—sheltering the developers from oscillating public preference and unpredictable political winds. *Home Builders*, 215 Ariz. at 154, ¶ 28 ("[D]evelopers would be loathe to enter into agreements requiring them to provide for part of the public infrastructure knowing that the governing authority could still require a larger contribution toward the public infrastructure in the future or that a successor in interest entity would not be bound by the agreement. The agreement would simply be too uncertain."); 3 *Rathkopf's The Law of Zoning and Planning* § 44:16 (4th ed. 2020) ("Development agreements can reduce this risk, especially when both the developer and the local government agree that a project would benefit the community."). The Town points to no authority that local governments may enter and then flout their statutorily authorized contracts—all without judicial review.

¶24 Second, the Town argues the superior court erroneously "substituted [its] judgment for that of the legislative bodies responsible for passing zoning regulations," and criticizes the 2003 Development Agreement and 2003 Plan as a "developer utopia" that "undercut[s] the health, safety and welfare component of zoning." But the court only found the Town and Merrill voluntarily entered into a 35-year binding development agreement, and then ordered the Town to perform its contractual promises, citing both A.R.S. § 9-500.05 and the Contract Clause of Arizona Constitution. Ariz. Const., art. 2, § 25. And the Town's current description of the 2003 Development Agreement contradicts the terms of that agreement, which characterizes the 2003 Plan as "in the best interest of the Town and the health, safety and welfare of its residents," and as promising "significant benefits to [the] Town."

¶25 Arizona law does not foist development agreements on local governments, A.R.S. § 9-500.05(A), and the Town could have negotiated

further concessions from Merrill if so desired. *See* Shelby D. Green, *Development Agreements: Bargained-For Zoning That is Neither Illegal Contract Nor Conditional Zoning*, 33 Cap. U.L.Rev. 383, 394, 407 (2004) ("[A] municipality is able to set definite conditions that govern the process of development, thus limiting the potential negative impacts from the development on neighboring land and the community."). Whatever its current opinion, the Town fully and formally embraced the Development Agreement and 2003 Plan in 2003. *See Rathkopf's*, § 44:16 ("Development agreements are authorized by state legislation in order to promote the general welfare by allowing a reasonable balancing of the public and the private interest in ascertaining with reasonable certainty the requirements that must be met for a specific development project.").

¶26          The Town also contends the superior court disregarded Arizona law that requires municipalities to enlist public participation in the zoning processes. *See* A.R.S §§ 9-462.03, -462.04. We disagree. The court simply enforced the plain terms of a development agreement, itself the product of Arizona law. We do not discount the tension between yesterday's binding promises and today's public opinion, but having agreed to the Development Agreement in 2003, the Town must comply with its terms.

## II.          Amendment and Abandonment

¶27          The Town next contests the superior court's contractual interpretation. First, the Town argues the court erroneously "determined that the 2003 [Plan] could not be amended without amending the [Development Agreement]." That overstates the court's holding, however, which found (1) Merrill acquired certain vested rights under the Development Agreement as described in the 2003 Plan and (2) the Town could not amend those vested rights without amending the Development Agreement.

¶28          Second, the Town contends it permissibly amended the 2003 Plan "by ordinance." But the 2003 Plan was not a stand-alone contract; it was attached to and incorporated in the Development Agreement, which expressly required that amendments be in writing, signed by the parties, and filed with the Pinal County Recorder within ten days. *See* A.R.S. § 9-500.05(C). The Town could not amend the 2003 Plan absent a writing signed by both parties and recorded, especially in a way that would violate the Development Agreement's terms.

¶29      Third, the Town argues the court erroneously recognized inconsistent development plans (2003 Plan versus 2007 Plan) as simultaneously operable. But that misstates the court's holding. The court held (1) the 2003 Plan controls to the extent it established vested rights protected by the Development Agreement, and (2) the 2007 Plan and Rezoning Ordinance control to the extent they do not interfere with those vested rights.

¶30      Beyond that, neither the 2007 Plan nor Rezoning Ordinance alter the mining rights of the Development Agreement and 2003 Plan. The 2007 Plan only mentions mining to explain the site's historical use "for mining and agricultural purposes." The Rezoning Ordinance only states that the parties "agree[d] to work together in good faith to modify any applicable portions of the . . . Development Agreement that may . . . conflict with this [Plan] Amendment approval." It does not identify mining as a non-conforming use or purport to amend or supersede the 2003 Development Agreement.

¶31      Alternatively, the Town argues that Merrill abandoned his vested mining rights under the Development Agreement by negotiating the Rezoning Ordinance and 2007 Plan. We are not persuaded. The superior court rejected this argument, and the record includes substantial evidence showing that Merrill never intended to amend or abandon his right to mine on the Property when he requested and then renegotiated the zoning change in 2007. *See Kocher*, 206 Ariz. at 482, ¶ 9 ("A finding of fact is not clearly erroneous if substantial evidence supports it, even if substantial conflicting evidence exists.").

¶32      During their protracted 2007 negotiations, Merrill and the Town never mentioned, much less negotiated, the mining rights established by the Development Agreement and the 2003 Plan. Merrill testified that he did not intend to abandon the mining rights. To the contrary, he wanted to maximize the value of his investment, including the residential development rights and the mining rights. To that end, Merrill continued searching for and negotiating with potential suitors to purchase his mining rights—after the 2007 Plan and Rezoning Ordinance. He also continued to pay "to monitor and maintain environmental permits for the mine," and he signed a long-term lease to enter the Property "for the purposes of mining exploration." By contrast, the Town offered no documents or communications showing that Merrill intended to abandon his valuable mining rights. The court also found Merrill credible. *See Castro v. Ballesteros-Suarez*, 222 Ariz. 48, 51, ¶ 11 (App. 2009) (this court "giv[es] due

regard to the opportunity of the [superior] court to judge the credibility of witnesses").

### III.       Judgment and Remedies

**¶33**        The Town argues the superior court improperly issued an advisory opinion when it held that FC could obtain specific performance if the Town were to breach the Development Agreement because FC did not even claim the Town has breached the Agreement.  We find no error.  On summary judgment, the Town argued that FC could not obtain specific performance if the Town breached the Development Agreement.   FC disagreed.   The Declaratory Judgment Act permits courts to construe contracts "either before or after there has been a breach," A.R.S. § 12-1833.

### IV.       Attorney Fees

**¶34**        And last, the Town challenges the superior court's award of $1.7 million in attorney fees to FC as the prevailing party under A.R.S. § 12-341.01.  The Town argues that A.R.S. § 12-341.01 did not apply because the lawsuit was not a contested action arising out of a contract, adding that any award should have been capped at $10,000 under A.R.S. § 12-348.  Contrary to the Town's argument, this lawsuit did arise out of a contract—the Development Agreement—and FC sued the Town to enforce the terms of that contract. *See ML Servicing Co., Inc. v. Coles*, 235 Ariz. 562, 570, ¶ 31 (App. 2014).  Moreover, A.R.S. § 12-348 does not bar an award under A.R.S. § 12-341.01. *Kadish v. Ariz. State Land Dep't*, 177 Ariz. 322, 328 (App. 1993).

**¶35**        The Town also contests the fee award as excessive.  We find no abuse of discretion. *See Modular Mining Sys., Inc. v. Jigsaw Techs., Inc.*, 221 Ariz. 515, 521, ¶ 21 (App. 2009).  The superior court used high-stakes or bet-the-company litigation as a barometer to determine the amount of reasonable fees and discounted FC's request by 10 percent.  Although some of the awarded fees related to an eminent domain claim and other counterclaims, the court found these claims were "interwoven" with the claims under the Development Agreement; it thus properly included them in the fee award. *See id.* at 522, ¶ 23.  Lastly, we are mindful that the superior court—given its long history with this case and these parties—is far better suited than this court to determine the amount of reasonable attorney fees.

## CONCLUSION

¶36  We affirm the superior court's judgment in all respects.  We grant FC's request for attorney fees and costs on appeal under A.R.S. §§ 12-341.01 and 12-341, contingent on compliance with ARCAP 21.



AMY M. WOOD • Clerk of the Court
FILED: AA